483 A.2d 456

**William W. AGRISS, Appellant,**

v.

**ROADWAY EXPRESS, INC.**

Superior Court of Pennsylvania.

Submitted Dec. 15, 1983.

Filed Sept. 14, 1984.

Reargument Denied Nov. 20, 1984.

Petition for Allowance of Appeal Denied April 24, 1985.

298

Ronald J. Mishkin, Stroudsburg, for appellant.
George W. Westervelt, Jr., Stroudsburg, for appellee.

Before SPAETH, President Judge, and CIRILLO and JOHNSON, JJ.

## OPINION

CIRILLO, Judge:

"The security of his reputation or good name from the arts of detraction and slander, are rights to which every man is entitled by reason and natural justice; since without these, it is impossible to have the perfect enjoyment of any other advantage or right." 1 W. Blackstone, Commentaries *134.

Appellant William Agriss sued his employer, Roadway Express, Inc., for what he considered a slight to his good name. A jury trial was held in the Monroe County Court of Common Pleas. After appellant had presented his evidence the court entered a nonsuit. This appeal followed.

The standard of review we utilize on appeals from nonsuits is given in *McNally v. Liebowitz*, 498 Pa. 163, 170, 445 A.2d 716, 717 (1982):

The standard for determining whether an involuntary nonsuit should have been granted is:

... plaintiff must be *given the benefit of every fact and reasonable inference arising from the evidence.* (Citation omitted). *All conflicts in the testimony must be resolved in plaintiff's favor* and the entry of the compulsory nonsuit is only supportable in a clear case where the facts and circumstances have as the only conclusion the absence of liability.

*Rutter v. Northeastern Beaver County School District,* 496 Pa. 590, 595, 437 A.2d 1198, 1200 (1981) (Emphasis added), citing *McKenzie v. Cost Brothers,* 487 Pa. 303, 307, 409 A.2d 362, 364 (1979).

*Morena v. South Hills Health System,* 501 Pa. 634, 462 A.2d 680 (1983); *Hawthorne v. Dravo Corp., Keystone Division,* 313 Pa.Super. 436, 460 A.2d 266 (1983). Guided by this standard, we review the evidence.

Appellant had been employed by Roadway Express since 1976 as a truck driver. In February 1979 he was elected as

a shop steward for Teamsters Local 229, the union representing Roadway employees based at Roadway's facility in Tannersville, Pennsylvania.

On December 21, 1979, Agriss returned from a round trip to Hartford, Connecticut, and entered the Tannersville terminal. He was scheduled to begin his vacation that day, and went to the dispatcher's window to collect his vacation paycheck. The dispatcher told Agriss to see the driver foreman, Steve Versuk, before leaving. Versuk handed Agriss a company "warning letter," signed by Versuk and initialed by Roadway relay manager Joe Moran. The letter read:

> By reason of your conduct as described below, it is necessary to issue this notice of warning. On 12/21/79 at Tannersville, Pennsylvania you violated our policy (or contract) by opening company mail. Subsequent violations of any company policy or contract will result in your receiving more severe disciplinary action up to and including discharge in accordance with Article 44 of the Central Pa Over-the-road and Local Cartage Supplemental Agreement.

The accusation in the letter was false, as Agriss had never, on that or any other day, opened company mail.

Agriss immediately took the letter to Joe Moran and denied the charge. Moran refused to withdraw the warning. Agriss then wrote out and presented to Moran a formal protest, which Moran rejected. Under the contractual grievance procedure between Roadway and the Teamsters, such a protest was the only remedial step open to an employee receiving a warning letter.

In accordance with the normal grievance procedure, both the warning letter and Agriss's protest were forwarded to the union business agent, Peter Fiore, in Stroudsburg, Pa. The procedure in addition provided for the warning letter to be distributed to Roadway's manager of labor relations and to Agriss's employee personnel file.

After fruitlessly trying to convince Moran to drop the charge, Agriss went to Roadway's district safety supervi-

sor, Ronald Brophy, thinking Brophy might know something about the charge. While Agriss was talking with Brophy in Brophy's office, Moran entered and began "interrogating" Agriss about opening company mail. Unable to resolve to Moran's satisfaction that the charge was unfounded Agriss left the terminal.

Shortly thereafter, Agriss flew with his girlfriend to Hawaii to spend the holidays. While Agriss was in Hawaii, Roadway driver Joseph Verdier heard stories about the warning circulating in the drivers' room at the Tannersville terminal. He heard other drivers and a Roadway dispatcher saying that Agriss was going to be fired for looking into company mail.

When Agriss returned to work on the 7th or 8th of January, 1980, several drivers asked him about the warning letter, and he heard the charge against him bandied over the CB radio. Aside from Versuk, Moran, and Brophy, Agriss had mentioned the charge only to his girlfriend.

On January 11 Agriss approached Moran to discuss the charge further. Agriss, Moran, and driver foreman Ron Cropt took up the discussion in Cropt's office. District manager Mike Wickham was walking by the office and stopped in. The discussion became heated, and loud enough to be heard by Roadway employees outside Cropt's office. At one point Wickham accused Agriss, "You read my _____ mail."

Over the next year Agriss continued to receive comments and questions about the warning letter from Roadway workers and union officials. Agriss instituted this suit, claiming that Roadway had defamed him. Trial began on January 23, 1981. After the plaintiff rested his case, the court granted the defendant's motion for compulsory nonsuit, ruling that the plaintiff's evidence failed to prove a cause of action for defamation. The court en banc denied the plaintiff's petition to remove the nonsuit.

After a thorough review of the record and the applicable law, we have concluded that the plaintiff's evidence was

sufficient to go to the jury, and therefore that the nonsuit should be removed and the plaintiff granted a new trial.

■ The plaintiff's burden of proof in a defamation case is set out in 42 Pa.C.S. § 8343(a):

*Burden of plaintiff.*—In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

*See also Dunlap v. Philadelphia Newspapers, Inc.,* 301 Pa.Super. 475, 448 A.2d 6 (1982) (plaintiff has burden to prove falsity of defamatory statement).

In finding appellant's evidence insufficient, the trial court ruled that: 1) the words "opening company mail" were incapable of a defamatory meaning as a matter of law; 2) there was insufficient proof that the defendant had published the words; 3) the plaintiff failed to prove "actual harm"; 4) the words complained of were not "libel per se" and the plaintiff failed to prove that they caused him special harm. In its opinion and order dated April 20, 1982, the court en banc upheld the trial court and further refined part 2 of the trial court's ruling by holding that to the extent the plaintiff's evidence proved publication, it was privileged publication. We address in turn each of the court's holdings.

1. *Defamatory character of the words "opening company mail"*

■ The threshold question in an action for defamation is whether the communication at issue is capable of a

defamatory meaning. It is for the court in the first instance to make this determination; but if the communication could be understood as defamatory then it is for the jury to determine whether it was so understood by the recipient. *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 273 A.2d 899 (1971); *Dunlap v. Philadelphia Newspapers, supra.*

A publication is defamatory if it tends to blacken a person's reputation or expose him to public hatred, contempt, or ridicule, or injure him in his business or profession. *Corabi, supra; Cosgrove Studio and Camera Shop, Inc. v. Pane,* 408 Pa. 314, 182 A.2d 751 (1962); *Dunlap, supra.* "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559 (1977); *Thomas Merton Center v. Rockwell International Corp.,* 497 Pa. 460, 442 A.2d 213 (1981), *cert. denied,* 457 U.S. 1134, 102 S.Ct. 2961, 73 L.Ed.2d 1351 (1982); *Rybas v. Wapner,* 311 Pa.Super. 50, 457 A.2d 108 (1983); *Beckman v. Dunn,* 276 Pa.Super. 527, 419 A.2d 583 (1980); *Vitteck v. Washington Broadcasting Co.,* 256 Pa. Super. 427, 389 A.2d 1197 (1978). For purposes of the threshold determination whether a communication could be understood as defamatory, it is not necessary for the communication actually to have caused harm to reputation; defamatory character depends on the general tendency of the words to have such an effect. *Corabi, supra; Miller v. Hubbard,* 205 Pa.Super. 111, 207 A.2d 913 (1965); Restatement, *supra,* § 559 Comment d. However, it is not sufficient if the words are merely embarrassing or annoying to the plaintiff. *Beckman v. Dunn, supra.*

The court should read an allegedly libelous statement in context. *Corabi, supra.* The nature of the audience seeing or hearing the remarks is also a critical factor in assessing whether a communication is capable of a defamatory meaning. *Beckman, supra.*

The test is the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate. The words must be given by judges and juries the same signification that other people are likely to attribute to them.

*Corabi, supra,* 441 Pa. at 447, 273 A.2d at 907. Nevertheless, neither the mere susceptibility of an article to an interpretation which would render it innocuous nor the intention of the author conclusively defeats a right of action for libel. *Id.; Brophy v. Philadelphia Newspapers, Inc.,* 281 Pa.Super. 588, 422 A.2d 625 (1980).

With these principles in mind we turn to the parties' arguments on the defamatory character of the charge "opening company mail."

Appellant contends that the words could have been understood to impute to him at least dishonesty, lack of integrity, and untrustworthiness, and at worst the crime of illegally opening another's United States mail. *See* 18 U.S.C. § 1702. He argues that the charge therefore had the potential to damage his reputation among fellow workers, especially in his capacity as a union official entrusted with handling employee grievances against the company.

For its part appellee argues that, "Taken at its worst, the warning issued in this case implies that Agriss is nosey or is eavesdropping on company affairs. There is no accusation of crime...." Brief for Appellee at 5. "[T]he words were not calculated to demean Agriss; they were intended to communicate to him a warning not to violate company policy." *Id.* at 6.

The court en banc agreed with appellee's interpretation, saying, "It appears to us that the words 'opening company mail' in the context in which they were delivered and with regard to the audience most likely to receive them amounted to little more than a benign reprimand for a purported breach of company policy." Slip op. at 4.

We have considered the court en banc's construction of what the words actually were meant to convey, but we cannot agree that as a matter of law the words can be confined to such a benign meaning. The plaintiff in this case attempted to prove that the company's publication of the charge "opening company mail" was not an official reprimand through proper channels, but a malicious dissemination of false charges to employees at large. Assuming this wider publication to have been proven, *see* section 2 *infra*, the words' potential to expose appellant to public contempt and ridicule becomes clearer. *See Collins v. Dispatch Publishing Co.*, 152 Pa. 187, 25 A. 546 (1893) (on the meaning to be attached to the word "intimacy").

■ Appellant proved, for purposes of overcoming a motion for nonsuit, that when he returned from his vacation speculation was rampant among his fellow employees and union men about what exactly he had done and whether he would be discharged for it. Obviously the charge of "opening company mail" implied more to some people than that he had received a benign reprimand. For a Roadway employee to be charged with opening company mail was highly uncommon. Appellant testified that in all his time as a union steward, during which he had dealt with "thousands" of grievances, he had never heard of an employee's being warned or cited for opening company mail. T.T. at 73–74. Moreover, the specific misconduct alleged—opening mail he had no right to open—reasonably could be interpreted to call in question appellant's general character for honesty, integrity, or trustworthiness. In fact, appellant testified that the accusation prompted people to ask him what he was accused of stealing. *Id.* at 56. Giving appellant the benefit of inferences to which he is entitled, the charge "opening company mail" was capable of impugning appellant's good name or reputation in the popular sense, and these are the interests that defamation law seeks to protect. *Spain v. Vicente*, 315 Pa.Super. 135, 461 A.2d 833 (1983); *Rybas v. Wapner, supra.*

Appellee calls our attention to the following cases in which Pennsylvania appellate courts found publications to be nondefamatory as a matter of law: *Scott-Taylor, Inc. v. Stokes*, 425 Pa. 426, 229 A.2d 733 (1967) (characterization of architect's buildings as "chicken coops"); *McAndrew v. Scranton Republican Publishing Co.*, 364 Pa. 504, 72 A.2d 780 (1950) (characterization of politician as favoring "a little Communism"); *Redding v. Carlton*, 223 Pa.Super. 136, 296 A.2d 880 (1972) (township supervisor, considering purchase for township of lands he partly owned, accused of conflict of interest "and perhaps much more"). *See also Rybas v. Wapner, supra* (characterization of plaintiff as anti-Semitic not actionable).

Given the unique context and factual situation of each defamation case, it is not particularly helpful to compare the words "opening company mail" with widely dissimilar words alleged to be defamatory in other cases. The rule of law appellee contends for, on which the cited cases more or less turn, is that "Statements which represent difference of opinion or are annoying or embarrassing, are without more not libelous." *Bogash v. Elkins*, 405 Pa. 437, 176 A.2d 677 (1962). *See also Braig v. Field Communications*, 310 Pa.Super. 569, 456 A.2d 1366 (1983) (expression of opinion not actionable in defamation unless reasonably understood to imply defamatory allegation of fact); *accord*, Restatement, *supra*, § 566. The words "opening company mail" were not an expression of opinion, but a factual allegation charging appellant with a concrete act of impropriety. And as we have already indicated, in our opinion the words had the potential to cause harm greater than mere annoyance or embarrassment. *Compare, e.g., Mercado v. Hoefler*, 190 Cal.App.2d 12, 11 Cal.Rptr. 787 (1961) (defamatory to say of employee that he took papers out of employer's private file); *Potter v. Milbank Manufacturing Co.*, 489 S.W.2d 197 (Mo.1972) (defamatory for plaintiff's employer to publish charge plaintiff was argumentative, irritable, and insecure, and his work slow and unsatisfactory); *Arnold v. Sharpe*, 37 N.C.App. 506, 246 S.E.2d 556 (1978) (libelous to write of

employee that she was troublemaker and gossip and could not get along with others), *rev'd on other grounds,* 296 N.C. 533, 251 S.E.2d 452 (1979).

We hold that the words "opening company mail," as applied to appellant and circulated among his fellow employees, were capable of a defamatory meaning.

### 2. *Sufficiency of proof of publication/Existence of privilege*

The issues of publication and privilege intertwine in this case to form the question: Was appellant's evidence sufficient to prove that Roadway published the charge "opening company mail" in a manner that was not privileged?

■■ In general, publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed. *Gaetano v. Sharon Herald Co.,* 426 Pa. 179, 231 A.2d 753 (1967); Restatement, *supra,* § 577. By its nature, the question whether there has been publication by the defendant is a question of fact for the jury.

■■ Liability for publication of defamatory matter may be defeated by a privilege to publish the defamation. One who publishes defamatory matter within the scope of an absolute privilege is immune from liability regardless of occasion or motive. *Sciandra v. Lynett,* 409 Pa. 595, 187 A.2d 586 (1963). However, such a privilege may be lost if the publisher exceeds the scope of his privilege by publishing the defamation to unauthorized parties. It is a question of law whether privilege applies in a given case, but a question of fact for the jury whether a privilege has been abused. *Montgomery v. City of Philadelphia,* 392 Pa. 178, 140 A.2d 100 (1958); *see also Smith v. Griffiths,* 327 Pa.Super. 418, 476 A.2d 22 (1984).

Here the court en banc held that "the publication of the warning letter to those parties who were proper recipients [under the collective bargaining agreement between Roadway and the union] was absolutely privileged." Slip op. at

6.   This holding undoubtedly was correct.   Our Court has held, based on the public policy favoring private resolution of disputes among employers, employees, and unions, that Pennsylvania law extends to employers an absolute privilege to publish defamatory matter in notices of employee termination.   *DeLuca v. Reader,* 227 Pa.Super. 392, 323 A.2d 309 (1974).   *DeLuca* defined the scope of the privilege as follows:

> [N]otices of dismissal for cause which are contemplated by a collective bargaining agreement and which are published by the employer *only to those with a legitimate interest in the subject matter* may not be made the subject of an action in libel, regardless of whether the allegations of cause are true or false and regardless of the actual motive behind the dismissal.

227 Pa.Super. at 399–400, 323 A.2d at 313 (emphasis added), *quoting Joftes v. Kaufman,* 324 F.Supp. 660, 662 (D.D.C. 1971).   *Accord, Hasten v. Phillips Petroleum Co.,* 640 F.2d 274 (10th Cir.1981); *Macy v. Trans World Airlines, Inc.,* 381 F.Supp. 142 (D.Md.1974).[1]

■   We agree with the learned court en banc of Monroe County that the absolute privilege pertaining to notices of dismissal applies with equal force to a warning letter.   For purposes of defamation privilege there is no valid distinction to be drawn between dismissal notices contemplated by a collective bargaining agreement and warning notices so contemplated.   Roadway therefore had an absolute privilege to publish Agriss's warning letter to parties entitled to receive it under the collective bargaining agreement.   These parties were Agriss himself; Peter Fiore, the union business agent; and Roadway management personnel Joe Moran, Steve Versuk, and the manager of labor relations.   The

---

1.   Other jurisdictions recognize only a conditional privilege to defame in a letter of employee termination.   *See, e.g., Hardee v. North Carolina Allstate Services, Inc.,* 537 F.2d 1255 (4th Cir.1976); *Arsenault v. Allegheny Airlines, Inc.,* 485 F.Supp. 1373 (D.Mass.1980); *Williams v. Kansas City Transit, Inc.,* 339 S.W.2d 792 (Mo.1960).   *See also Keddie v. Pennsylvania State University,* 412 F.Supp. 1264 (M.D.Pa.1976) (interpreting Pennsylvania law as recognizing conditional privilege).   On the general subject of privilege to defame in the context of labor relations, *see* Annots., 60 A.L.R.3d 1041, 1080 (1974).

copy of the warning letter sent to Agriss's employee personnel file also was covered by the privilege.

However, it is undisputed that while Agriss was away in Hawaii the contents of his warning letter were widely disseminated to persons who were not authorized to read the letter. Joseph Verdier testified that he heard several drivers and a company dispatcher talking about the warning in the drivers' room at Tannersville. Agriss himself testified that upon returning from Hawaii he was greeted with comments and questions about the warning from several drivers, and also heard the charge against him discussed indiscriminately over the citizens band radio.[2]

■ Agriss testified without qualification that aside from the parties who were privileged under the grievance procedure, he had told no one else at Roadway about the charge except Ronald Brophy, a management-level employee. For purposes of overcoming the nonsuit motion, therefore, appellant proved that the contents of the warning letter were published in an unprivileged manner, and that only a handful of possible sources could have originated the unprivileged publication. The question we turn to now is

2. The failure of either Verdier or Agriss to name the third persons he overheard discussing the defamatory charge was a factor affecting the weight, not the sufficiency, of the evidence of publication. *Compare Lombardi v. Flaming Fountain, Inc.,* 327 So.2d 39 (Fla.App.1976) (evidence of publication sufficient where plaintiffs proved they were accused loudly in restaurant, with unidentified diners present, of stealing) *with Coscia v. Fruehauf Corp.,* 10 Phila. 394 (1984) (evidence of publication insufficient where plaintiff testified there "may have been other people" present who heard plaintiff called a thief). It is true that in Pennsylvania the plaintiff in a defamation action must plead with sufficient particularity the identity of persons to whom a defamation was published. *Spain v. Vicente, supra* part 1; *Itri v. Lewis,* 281 Pa.Super. 521, 422 A.2d 591 (1980); *Gross v. United Engineers and Constructors, Inc.,* 224 Pa.Super. 233, 302 A.2d 370 (1973) (allocatur granted July 3, 1973); *Raneri v. Depolo,* 65 Pa.Cmwlth. 183, 441 A.2d 1373 (1982). However, the "particularity" required by these cases can be only such particularity as the facts of the case allow. *Compare Dominiak v. National Enquirer,* 439 Pa. 222, 266 A.2d 626 (1970); Annot., 42 A.L.R.3d 807, §§ 5–6 (1972) (where defamatory material is contained in mass media, "publication" occurs when media released or distributed for mass sale to public). To make an example of this case, Agriss testified to having heard unknown truck drivers discuss the defamatory charge over the CB radio; his allegations as to the identities of these drivers could not be any more specific if they remained unknown to him. In any event, on appeal Roadway does not argue insufficiency of the evidence on this score, and in fact concedes that appellant "showed knowledge of the warning by unauthorized people," Brief for Appellee at 13.

whether the evidence was sufficient to hold Roadway liable for unprivileged, excessive publication.[3]

Appellant argues that circumstantial evidence permitted the link to be made. He relies on the historic decision in *Smith v. Bell Telephone Co. of Pennsylvania*, 397 Pa. 134, 153 A.2d 477 (1959), in which our Supreme Court said,

> It is not necessary, under Pennsylvania law, that every fact or circumstance point unerringly to liability; it is enough that there be sufficient facts for the jury to say reasonably that the preponderance favors liability.... The facts are for the jury in any case whether based upon direct or circumstantial evidence where a reasonable conclusion can be arrived at which would place liability on the defendant. It is the duty of plaintiff to produce substantial evidence which, if believed, warrants the verdict he seeks. The right of a litigant to have the jury pass upon the facts is not to be foreclosed just because the judge believes that a reasonable man might properly find either way. A substantial part of the right to trial by jury is taken away when judges withdraw close cases from the jury. Therefore, when a party who has the burden of proof relies upon circumstantial evidence and inferences reasonably deducible therefrom, such evidence, in order to prevail, must be adequate to establish the conclusion sought and must so preponderate in favor of that conclusion as to outweigh in the mind of the factfinder any other evidence and reasonable inferences therefrom which are inconsistent therewith.

397 Pa. at 138–39, 153 A.2d at 480.

In rejecting appellant's argument the court en banc, also quoting from *Smith*, drew on the equally well settled rule that "the jury may not be permitted to reach its verdict

---

3. Possible issues of agency have not surfaced in this case. Clearly appellant's theory of liability is that Roadway bears responsibility for any publication by its management personnel, and appellee has not to this point challenged the theory that it would be so liable. Nor does appellee dispute the notion that it had control, through its managers or agents, of the employee personnel file. We would expect these matters to be better developed on the record had appellee presented evidence. However, since we must give appellant the benefit of reasonable inferences from the evidence, we will on this appeal consider Roadway to have been responsible for both its managers and its files.

merely on the basis of speculation or conjecture, but ... there must be evidence upon which logically its conclusion may be based." *Id.*, 397 Pa.Superior Ct. at 138, 153 A.2d at 479.

■ Although admittedly this is a close case, we conclude that appellant's evidence met the *Smith* test for circumstantial proof. Without resort to conjecture, the jury would have had a rational basis to choose, over any other inference suggested by the evidence, the inference that Roadway disseminated the defamatory matter.

■ Appellant's evidence, if believed, reasonably suggested only one party outside Roadway's control, Peter Fiore, who could have published the defamation. If Fiore did not originate publication, the only other reasonable inference to be drawn is that Roadway managers or agents did.[4] Having concluded that appellant's evidence narrowed the field of conceivable publishers to Fiore and Roadway, we iterate that it is beyond the power of the court to say whether two or more reasonable inferences are equal. *Id.* In order to avoid nonsuit, the plaintiff need not negate all other possible causes of an occurrence, *Jones v. Treegoob*, 433 Pa. 225, 249 A.2d 352 (1969), or prove with mathematical certainty, to the exclusion of other possibilities, that an occurrence could only have been caused in one manner consistent with the defendant's liability. *Calhoun v. Jersey Shore Hospital*, 250 Pa.Super. 567, 378 A.2d 1294 (1977).

However, lest it be objected that there was still room for impermissible speculation as between two possible sources of publication, we must emphasize that there was evidence from which the jury reasonably could have concluded that Roadway was a more likely source of publication than Fiore. On cross-examination of appellant, defense counsel suggested that Fiore might have undertaken to investigate

---

4. In its opinion the court en banc suggested that another possible source of publication was the January 11 meeting in driver foreman Ron Cropt's office. At that meeting Agriss and three management personnel discussed the charge in voices loud enough to be heard by other Roadway employees. However, that incident cannot account for the publication that had already ocurred by the time Agriss arrived back at work on the 7th or 8th of January.

the warning letter, and in the course of investigation broached the charge against appellant to unauthorized Roadway employees. T.T. at 82. In response and on redirect examination, appellant testified that Fiore's visits to Tannersville were very rare, that ordinarily any inquiry from Fiore came to his attention, and that Fiore had never contacted him personally about the letter. *Id.* at 82, 89, 90. Finally, appellant's evidence might have suggested to the jury that Roadway had a motive for defaming him, namely to discredit him as a union shop steward. Taken as a whole, the evidence created a jury question on publication.

Our holding that circumstantial evidence was sufficient to prove publication by the defendant parallels other Pennsylvania decisions permitting the factfinder to infer liability despite the absence of direct proof linking the party held liable to wrongful or negligent acts. *See Sperrazza v. Cambridge Mutual Fire Insurance Co.,* 313 Pa.Super. 60, 459 A.2d 409 (1983) (no direct evidence linking insurance claimants to arson); *Speicher v. Reda,* 290 Pa.Super. 168, 434 A.2d 183 (1981) (action under Pennsylvania dram shop act; evidence sufficient to prove driver was served alcohol while "visibly intoxicated," even though no direct evidence of driver's condition while in tavern); *Bethay v. Philadelphia Housing Authority,* 271 Pa.Super. 366, 413 A.2d 710 (1979) (no witness to boy's fall to death down elevator shaft; evidence of landlord's negligence sufficient); *Canery v. Southeastern Pennsylvania Transportation Authority,* 267 Pa.Super. 382, 406 A.2d 1093 (1979) (no witness to subway accident).

We have found no comparable case in Pennsylvania's law of defamation. However, *Tumbarella v. Kroger Co.,* 85 Mich.App. 482, 271 N.W.2d 284 (1978), is squarely on point and in line with our holding. There the Kroger Company circulated a letter to managers of its grocery stores, telling them the plaintiff had been fired for theft. Subsequently the plaintiff received phone calls from several employees in the other stores inquiring about the charge. The court held that there was a reasonable inference that the privileged

communication to the store managers had been republished to unauthorized persons, and that Kroger could be held liable. The court also applied the rule that "one who publishes a defamatory statement is liable for the injurious consequences of its repetition where the repetition is the natural and probable result of the original publication." 85 Mich.App. at 496, 271 N.W.2d at 290. *Accord*, W. Prosser, *Law of Torts* § 112 at 762 & nn. 16–18 (4th ed. 1971); 53 C.J.S. *Libel and Slander* § 85. The *Tumbarella* court further held that it is a question of fact whether repetition is the natural and probable result of an original publication. *Cf. Pulliam v. Bond*, 406 S.W.2d 635 (Mo.1966) (defendant not liable for unauthorized republications); *Jorgensen v. Pennsylvania Railroad*, 25 N.J. 541, 566, 138 A.2d 24, 38 (1958) ("A mere showing of extensive publication without proof tending to connect the defendant to such publication is not sufficient to destroy ... qualified privilege ....").

■ We believe that *Tumbarella* correctly states the law applicable to this type of case, although we would slightly modify the quoted portion of the rule to fit the special facts of this case and the law of Pennsylvania on absolute privilege. The court on retrial should instruct the jury: 1) that Roadway enjoyed an absolute privilege to publish the warning letter to those entitled to receive it under the collective bargaining agreement; 2) that it is for the jury to determine whether the evidence proves an original publication by Roadway *outside* the scope of its privilege; and 3) that if they do find unprivileged publication, they must determine to what extent repetition resulted, and to what extent it was a natural and probable result of the original unprivileged publication. So instructed, the jury permissibly could find Roadway liable for publishing the contents of the warning letter.

### 3. *Actual harm*

■ The court held that appellant failed to prove "actual harm." The requirement that a plaintiff in a defamation case prove "actual harm" derives from the landmark case

of *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), in which the United States Supreme Court delineated certain significant limitations the First Amendment imposes on defamation actions by private individuals. *Gertz* continued the constitutional narrowing of state defamation law begun in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), which laid down the rule that public officials can recover for defamations concerning their official capacities only where the publisher acts with knowledge or reckless disregard of the falsity of the publication.

In *Gertz* the Court held that, consistently with the free speech and press guarantees of the First Amendment as applied to the states through the Fourteenth Amendment, state defamation law 1) may not impose liability without fault on the publisher of defamatory matter; 2) may permit recovery of "compensation for actual injury," but not presumed or punitive damages unless *New York Times* "actual malice" is present, that is, unless the publisher has acted with knowledge or reckless disregard of the falsity of the publication.

The *Gertz* Court declined to define "actual injury," "actual harm," or "actual loss," the three terms it used interchangeably to designate the new constitutional limits on recovery in a defamation action where the plaintiff fails to prove "actual malice." The Court did say that

actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury.

418 U.S. at 350, 94 S.Ct. at 3012, 41 L.Ed.2d at 811.

█ We think appellant's evidence was sufficient to prove "actual harm" by this standard. From the evidence

the jury could have found that the charge "opening company mail" impaired appellant's reputation and caused him personal humiliation and mental anguish. The testimony of appellant and Joseph Verdier clearly tended to show that the charge held appellant up to ridicule and speculation among fellow employees that his dismissal was imminent. Although a jury might have chosen to assign a negligible dollar value to the reputational and emotional damage proved, nevertheless this was a matter for the jury, instructed appropriately of course. We find that the court erred in granting nonsuit for failure to prove actual harm.[5]

### 4. *"Libel per se"*

We have touched on the newest constitutional frontiers of the law of defamation, and now must backtrack to its oldest shibboleths. The trial court held that the charge "opening company mail" was not "libel per se," and that because it was not the plaintiff was obliged to prove special damages in order to recover. Appellant proved no special damages; thus the court's fourth ground for entering nonsuit.

Appellant quarrels mainly with the trial court's holding that the words "opening company mail" were not "libel per se." However, we are concerned also with what the court meant by "libel per se," and with the rule it applied upon determining that the words complained of in this case were

---

**5.** *Gertz's* sweeping effect on defamation actions by private individuals is still being assessed, and state defamation law still being rewritten in its wake. *See Rutt v. Bethlehem's Globe Publishing Co.,* 335 Pa.Super. ——, 484 A.2d 72 (1984) (Pennsylvania will apply negligence standard where plaintiff is not "public figure"); *Dunlap v. Philadelphia Newspapers, supra* part 1 (plaintiff has burden to prove falsity of publication). *Compare also Sindorf v. Jacron Sales Co.,* 27 Md.App. 53, 341 A.2d 856 (1975), *with Jacron Sales Co. v. Sindorf,* 276 Md. 580, 350 A.2d 688 (1976) (aff'g) (different approaches to whether *Gertz* applies to non-media defendants or to "purely private" defamations). One question left unanswered in *Gertz* is whether the First Amendment imposes any limits on recovery where the plaintiff proves *New York Times* "actual malice." The issue is not ripe for decision on this appeal. However, on retrial appellant may introduce sufficient evidence to prove that Roadway published the charge "opening company mail" with knowledge or reckless disregard of its falsity, in other words with "actual malice." At that point the court might have to decide whether and to what extent the jury could award punitive or presumed damages in excess of actual loss proven. The question would call in the first instance for an interpretation of First Amendment principles; if they were Amendment principles; if they were found to impose no restrictions, the question would have to be decided on the basis of evolving principles of state defamation law.

not "libel per se." Implicit in the court's decision to grant nonsuit is a distinction between "libel per se" and "libel per quod," and between different burdens of proof which these two forms of libel are thought to require. We have come to the conclusion that the "per se/per quod" distinction is without validity in the modern law of libel, and should be abolished as a means of allocating the plaintiff's burden of proof in a libel case. We also conclude that the trial court erred in nonsuiting appellant on the grounds of a rule based on the "libel per se" concept. However, our task of correcting the error is difficult because the very meaning of "libel per se," let alone its legal significance, is an enigma in this jurisdiction.

The import of "per se" in a defamation case is a problem that has kept Pennsylvania courts going in circles for generations. Originally the term meant one thing when attached to slander, and something entirely different when attached to libel. In the courts these separate meanings and the separate rules they entailed gradually drifted toward, into, and among one another, until nowadays "per se" is used so inconsistently and incoherently in the defamation context that any lawyer or judge about to use it should pause and replace it with the English words it is intended to stand for.

Recent attempts by the United States Court of Appeals for the Third Circuit to sort out the various meanings of "per se" in Pennsylvania defamation law have gone virtually unnoticed in the state courts, and arguably contribute their own share of confusion. In *Altoona Clay Products, Inc. v. Dun & Bradstreet, Inc.*, 367 F.2d 625 (3rd Cir.1966), the court distinguished between "actionable per se" and "defamatory per se." Whether a publication is "actionable per se," the court said, has to do with whether or not the plaintiff must prove special damages to recover for it, and this is "without question a matter of state law." *Id.* at 628. Not to be confused with this determination, the court said,

is whether a particular publication is defamatory on its face ("defamatory per se," "libelous per se," or "slander-

ous per se"). This latter determination is strictly procedural and means only that an "innuendo" must be or need not be pleaded. The authorities tell us that these pleading requirements are ofttimes ridiculous and frequently result in injustice. McCormick, Damages § 113 at 417–419; Prosser, Torts § 92 at 79 *et seq.* (2d ed.).

367 F.2d at 629. The court reiterated the same analysis of "per se" in *Rannels v. S.E. Nichols, Inc.,* 591 F.2d 242 (3rd Cir.1979), indicating that the Pennsylvania courts have done nothing in the intervening years to clarify Pennsylvania law.

We can appreciate the Third Circuit's effort to introduce some sort of order to a disordered area of state law, but we find the *Altoona Clay* case unsatisfactory because 1) it purports to announce a settled doctrine of "per se" which unfortunately finds no support in Pennsylvania defamation cases, and 2) it bestows an aura of legitimacy on the various and often conflicting meanings given the "per se" label, just when it is abundantly evident that use of the label should be reined in.

It is time to exert state court control over the "per se" concept, if only because it is primarily our responsibility, not the federal courts', to say what a plaintiff in defamation must plead and prove under Pennsylvania law. Here the plaintiff was thrown out of court on the ground that the libel he complained of was not "libel per se." To discharge our duty to pass on the propriety of the trial court's ruling, we must pull "libel per se" up by the roots and examine it. We cannot dispel completely the confusion that has been accreting for decades, but we can separate terminological chaff from kernels of legal principle.

The difficulty the courts have had with "per se" springs directly from the historical distinction between libel and slander. Before going further, we should make that distinction. Libel may be defined conveniently as "A method of defamation expressed by print, writing, pictures, or signs." Black's Law Dictionary 824 (5th ed. 1979). Slan-

der, broadly, is usually understood to mean oral defamation. *Id.* at 1244.[6]

"Per se" first cropped up in defamation law in connection with slander. At early common law a person generally could not recover for slanderous utterances unless they caused him "special harm," meaning

> harm of a material and generally of a pecuniary nature .... result[ing] from conduct of a person other than the defamer or the one defamed which conduct is itself the result of the publication or repetition of the slander. Loss of reputation to the person defamed is not sufficient to make the defamer liable under the rule ... unless it is reflected in material harm.

Restatement of Torts § 575, Comment b (1938). The common law courts' insistence that a plaintiff in slander prove "material harm" in turn "goes back to the ancient conflict of jurisdiction between the royal and ecclesiastical courts, in which the former acquired jurisdiction over some kinds of defamation only because they could be found to have resulted in 'temporal' rather than 'spiritual' damage." Restatement (Second) of Torts § 575, Comment b (1977).

Early exceptions to the requirement of proving special harm were carved for slanders imputing crime, loathsome disease, shortcomings affecting the plaintiff in his business, trade, profession, or calling, or (later) unchastity to a woman. Prosser, *supra,* § 112 at 754; 3 W. Blackstone, Commentaries *123–24. These "per se" slanders were supposed to be so naturally injurious that the law allowed recovery of

6. In the present case evidence of the precise "method" used to publish the charge "opening company mail" was sorely lacking. *See* section 2, *supra.* The only thing clear is that the words at one point were expressed in print in a warning letter. Perhaps in reliance on this one certain fact, the court and parties throughout have treated this as a libel case. To avoid unwarranted complexity, we will continue to do so. *Accord, General Motors Corp. v. Piskor,* 277 Md. 165, 352 A.2d 810 (1976). The approach makes sense, considering the libelous form of the warning letter and the rule that subsequent oral repetition of a libel does not change it to slander and vice versa. *See Mercado v. Hoefler, supra* part 1. We are told that the substantive differences between the law of libel and the law of slander are relics of the ancient past serving no useful purpose, *see* Prosser, *supra* part 2, at 764, but to this day they wield dead-hand influence over the law of defamation. Nowhere is the pervasive, perverse sway of the distinction more evident than where "per se" enters the discussion.

general or presumed damages for loss of reputation, even without proof of actual injury.

"Per se" and its counterpart "per quod" were common law pleading devices used to indicate whether the plaintiff's cause of action depended on general or special damages. Francis Murnaghan, in *From Figment to Fiction to Philosophy—the Requirement of Proof of Damages in Libel Actions*, 22 Cath.U.L.Rev. 1, 13 (1972), explains:

> In common law pleading, the right to recover general damages meant that the portion of the writ employed for institution of the suit devoted to specification of damage, and introduced by the words 'per quod,' became inapplicable whenever damages were presumed. To fill the void, and to signify that something had not been overlooked, the draftsmen in such cases would simply insert 'per se' where the allegations of damages, headed by the phrase 'per quod' otherwise would be expected.

These archaic pleading terms stuck so hardily to slander actions that today "slander per quod" and "slander per se" retain their original meanings as, respectively, slander actionable only on a showing of special harm to the plaintiff, and slander actionable even without special harm. *See* Murnaghan, *supra.* The substantive law of defamation continues to recognize the original four categories of slander "actionable per se," *see* Restatement (Second), *supra,* § 570, with all other slanders actionable only on a showing of special harm, *see id.,* § 575. *Accord, Solosko v. Paxton,* 383 Pa. 419, 119 A.2d 230 (1955), *aff'g* 4 Pa.D. & C.2d 240 (C.P. Somerset Co. 1954). *But see* part 3, *supra.*

The per se/per quod distinction in libel originated differently. It was used to distinguish libel defamatory on its face ("libel per se") from libel not defamatory on its face ("libel per quod"). "Libel per quod" required a showing of facts and circumstances imparting a defamatory meaning to otherwise innocent or neutral words.[7] The plaintiff in libel

---

7. Prosser's "classic case" of libel per quod is *Morrison v. Ritchie & Co.,* [1902] 4 Fr. 645, 39 Scot.L.Rep. 432. Defendant's newspaper published a report that the

per quod had to plead and prove the extrinsic facts (the "inducement") imparting defamatory meaning, and the defamatory meaning (the "innuendo") imparted. *General Motors Corp. v. Piskor,* 27 Md.App. 95, 117 n. 15, 340 A.2d 767, 782 n. 15 (1975), *aff'd in part, rev'd in part,* 277 Md. 165, 352 A.2d 810 (1976).

Originally, the per se/per quod distinction in slander, by which some slanders were actionable without proof of special damages while others were not, had no parallel application to libel. Any libel, whether libelous on its face or libelous only upon proof of extrinsic circumstances, was actionable with or without proof of special damages. The willingness of the law to presume damages for all libels as opposed to all slanders arose partly from the greater permanency, dissemination, and credence, and hence the greater harm, supposed naturally to attend defamations in printed or written form. *See Collins v. Dispatch Publishing Co., supra* part 1; Prosser, *supra,* at 751–52.

Inevitably, use of the identical per se/per quod terminology in two torts so similar in nature led to the distinct rules for libel and slander being blurred and melded together in the courts. The rule of slander per quod, requiring proof of special damages for any slander not coming under one of the four time-honored exceptions, came to be applied to "libel per quod" (i.e., libel not defamatory on its face). Under this "hybrid" rule of libel per quod, a libel not defamatory on its face was not actionable without proof of special harm. As a further twist to the hybrid scheme, a libelous imputation of crime, loathsome disease, unfitness for business or calling, or unchastity (the four imputations actionable without proof of special harm in slander) was held to be actionable without proof of special harm in libel, even if the libel were "per quod" (proven libelous through extrinsic facts). *See* Dean Prosser's *Libel Per Quod,* 46 Va.L.Rev. 839 (1960).

plaintiff had given birth to twins. There were readers who knew she had been married only one month. Prosser, *supra,* at 763 n. 30.

▌ The trial court en banc evidently applied this hybrid rule of libel per quod. It found appellant's evidence deficient for failure to show either "libel per se" or special harm. We agree that appellant's case did not establish that he suffered any economic or material loss amounting to "special harm." On the other hand, we believe that the words "opening company mail" did not require such proof of special damages under the hybrid rule because the charge imputed to appellant unfitness for business or calling and, arguably, criminal activity. We would, therefore, find that the trial court erroneously applied the hybrid rule to the facts of this case. However, we would be shirking our responsibility as an appellate court if we did not decide also whether the hybrid rule was the correct one to apply in the first place.

Although Prosser believed the hybrid rule of libel per quod to be the majority rule in America, *see* Prosser, *Torts, supra,* at 762–63, the American Law Institute, in both the First and Second Restatements of Torts, consistently has adhered to the traditional rule that all libels are actionable "per se," irrespective of special harm. Restatement of Torts § 569; Restatement (Second) of Torts § 569. The Institute views Prosser's hybrid rule as the "minority position." *See* Restatement (Second) of Torts § 569, Comment b. Laurence Eldredge, for many years Court Reporter for the Pennsylvania Supreme Court, championed the ALI position and disputed Prosser's. *See* Eldredge, *The Spurious Rule of Libel Per Quod,* 79 Harv.L.Rev. 733 (1966). Eldredge listed Pennsylvania among those states holding that all libels, whether defamatory on their face or through extrinsic facts, were actionable without the need to prove special harm. Upon surveying Pennsylvania cases, we are unable either to confirm or disconfirm Eldredge's view. Instead, our survey demonstrates that Pennsylvania law on the subject remains fundamentally unsettled. We have also found that there are indeed cases to support the court en banc's position that "libel per quod" is not actionable in

Pennsylvania without special damages. However, search-ing analysis and contrary authority cast grave doubt on these cases' validity.[8]

Perhaps the strongest case for the position that this jurisdiction follows the hybrid rule adopted by the trial court is *McDonald v. Lee*, 246 Pa. 253, 92 A. 135 (1914). There the Supreme Court held that it was not "libelous per se" to name the plaintiff in a list circulated among doctors to identify patients slow to pay their accounts. The Court concluded that "in the absence of averment of special damage, binding instructions were proper." 246 Pa. at 255, 92 A. at 136. The Court here may have been requiring proof of special damages because the list was not "libelous on its face." If so, the Court was following the hybrid rule. However, certain language in the opinion indicates that by saying the list was not "libelous per se," the Court meant only that it was incapable of a defamatory meaning. As one commentator said in reference to *McDonald*,

> It should be mentioned that a few Pennsylvania cases [footnote to *McDonald* omitted] seem to make a distinc-tion between libel actionable *per se* and libel actionable only on proof of special damages, similar to the distinc-tion made in slander cases. Since Pennsylvania definitely follows the general rule that any libel is actionable with-out proof of special damage, it is submitted that these cases are either bad decisions, or are confused statements to be explained in this way:—that the court meant to distinguish between libel (actionable without proof of special damages), and an action on the case for special

8. Trying to say where Pennsylvania stands on libel per quod is much like chasing shadows. Our search has turned up only one instance in the latter half of this century where a state appellate court used the term "per quod" in a defamation case, and that was only in passing. *Gaetano v. Sharon Herald Co.*, 426 Pa. 179, 183 n. 3, 231 A.2d 753, 756 n. 3 (1967). Perhaps such sparing use would be commendable if it evidenced an abandonment of archaic pleading terms. However, the courts continue to use "per se" without distinguishing between "defamatory on its face" and "actionable without proof of special damages," or between libel and slander. *See infra; Redding v. Carlton, supra* part 1, at n. 1. It is time to declare a settled rule on the subject.

damages, the result of defendant publishing words not defamatory, and therefore not libelous.

*Defamation in Pennsylvania*, 2 U.Pitt.L.Rev. 1 (1935).

In *Drebin v. Jewish World Publishing Co.*, 262 Pa. 169, 105 A. 58 (1918), the plaintiff was nonsuited because an article he complained of was not "actionable per se" and he alleged no special damages. The Supreme Court, in affirming in part and reversing in part, said that "If defamatory the law will presume the damage," 262 Pa. at 171, 105 A. at 58, and that "libelous" words were "actionable per se." This language comports with the traditional view that all libels, "per se" or "per quod," are actionable without proof of special damage. However, the Court also used language linking the need for an "innuendo" (the defamatory sense attached to otherwise non-defamatory words in a "libel per quod") with the need to aver "special damage." *Id.*

The trend of ambiguity that had crept into Pennsylvania law by virtue of *McDonald* and *Drebin* was reversed in *Boyer v. Pitt Publishing Co.*, 324 Pa. 154, 188 A. 203 (1936). There the plaintiff proved through innuendo that a newspaper article had libelled him. The plaintiff proved no special damages, and the Supreme Court, while noting this fact, left standing $2,500 in damages.

In 1938, the first Restatement of Torts adopted the position that all libels are actionable without proof of special harm. *Id.* § 569. Thereafter the Superior Court of Pennsylvania explicitly approved the Restatement position. *McAndrew v. Scranton Republican Publishing Co.*, 165 Pa.Super. 276, 67 A.2d 730 (1949) (citing *Boyer* and *Bausewine v. Norristown Herald, Inc.*, 351 Pa. 634, 41 A.2d 736 (1945), as in accord). *McAndrew*, however, was reversed on other grounds, 364 Pa. 504, 72 A.2d 780 (1950), and later decisions reintroduced the ambiguity that had previously existed in Pennsylvania law.

In *Cosgrove Studio & Camera Shop, Inc. v. Pane, supra* part 1, the Supreme Court stated that no averments nor proof of special damages were necessary where words were defamatory "in themselves," thus perhaps implying the

converse, that special damages are necessary where the plaintiff relies on extrinsic facts to show defamatory meaning. *Accord, Wilson v. Benjamin,* 332 Pa.Super. 211, 481 A.2d 328 (1984) (dictum).

In *Fegley v. Morthimer,* 204 Pa.Super. 54, 56, 202 A.2d 125, 126 (1964), the Superior Court made the similar statement that libel per se "is actionable without proof of special damages." The Court also cited *Cosgrove* in connection with the proposition that imputations of conduct "incompatible with ... duties of ... public office ..." are "actionable without proof of special harm or loss of reputation." *Id.* However, although *Fegley* was a libel case, the Court clearly was stating the rule for slander, as its further citation to sections 570 and 573 of the Restatement shows.

Finally, in *Baird v. Dun & Bradstreet,* 446 Pa. 266, 274, 285 A.2d 166, 171 (1971), the Supreme Court stated that "It is a general rule that defamatory words are not actionable, absent proof of special damage." While of course this is correct to say of slanders, as applied to libels it completely reverses the traditional rule that all libel is actionable without proof of special damages. We believe the statement cannot be taken at face value, and must be read in the context of the authorities cited for it: *Solosko v. Paxton, supra* (stating the general rule and exceptions for actionability in slander); Restatement of Torts § 569, Comments d, f.

█ Publication of Volume 3 of the Restatement (Second) of Torts in 1977 sets the stage for a revised interpretation of the law of Pennsylvania in the light of current authority. In section 569 of the Second Restatement, the American Law Institute has substantially readopted the rule of the First Restatement that all libels are actionable without proof of special harm. For a number of reasons, we believe the rule of section 569 recommends itself to this Court for adoption.

First, to adopt section 569 is in line with Pennsylvania's general tendency to follow the Restatement rule in def-

amation law. *See Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (Opinion by Brennan, J.).

■ Secondly, there is no longer any sound reason to distinguish for purposes of actionability between libels which are "defamatory on their face" and libels which are defamatory through extrinsic facts and circumstances. *See* Restatement (Second), *supra,* § 569, Comment b; *id.* § 580B. *Gertz v. Robert Welch, supra* part 3, has already placed strict constitutional limits on the ability of state defamation law to award money damages in the absence of provable harm to the plaintiff or his reputation. In *Rutt v. Bethlehem's Globe Publishing Co., supra* note 5, this Court, following *Gertz,* held that a plaintiff must establish at least negligent publication by the defendant in order to recover for defamation. *Cf. Matus v. Triangle Publications, Inc.,* 445 Pa. 384, 286 A.2d 357 (1971), *cert. denied,* 408 U.S. 930, 92 S.Ct. 2494, 33 L.Ed.2d 343 (1972). Given these newly-articulated constitutional requirements of actual harm to the plaintiff and actual fault on the part of the defendant, there is no sense and no reason in jurisprudence to impose a further artificial restriction, in the form of the need to prove "special damages," on the defamed plaintiff who seeks recovery for a "libel per quod."

■ Thirdly, as our review of state cases indicates, authority for the proposition that Pennsylvania ever departed from the traditional common law rule is weak and unconvincing. No Pennsylvania case in this century has stated a rationale for why libels not defamatory on their face should be any less actionable than libels defamatory on their face.

■ Fourthly, there are sound policy reasons for allowing a plaintiff to recover for any libel even where he cannot prove special harm in the form of direct economic or pecuniary injury. As Justice Eagen said in *Gaetano v. Sharon Herald Co., supra* note 8, 426 Pa. at 183, 231 A.2d at 755,

The most important function of an action for defamation is to give the innocent and injured plaintiff a

public vindication of his good name. Its primary purpose is to restore his unjustly tarnished reputation, and "reputation is the estimation in which one's character is held by his neighbors or associates." Restatement, Torts § 577, comment b (1938).

■ By its very nature, injury to reputation does not work its greatest mischief in the form of monetary loss. *See Gertz v. Welch, supra* part 3. Where an individual is made the victim of a false, malicious, and defamatory libel published to third persons, it is unfair to hold that vindication of his good name in the courts depends upon proof that the injury to his reputation has injured him economically as well. Once reputational damage alone is proven, the plaintiff in libel has proven his entitlement to recovery, and to make that recovery contingent on whether the damage was done by words "defamatory on their face" merely adds another irrelevant factor to the equation.

■ The perceived requirement of "special damages" has been narrowly interpreted by trial courts in Pennsylvania. It is seen as a complete bar to relief in defamation if the plaintiff fails to prove that reputational injury has caused concrete economic loss computable in dollars. *See McCabe v. Village Voice, Inc.*, 550 F.Supp. 525 (E.D.Pa. 1982); *Fogel v. Forbes*, 500 F.Supp. 1081 (E.D.Pa.1980); *Rannels v. S.E. Nichols, Inc.*, 447 F.Supp. 417 (E.D.Pa. 1978), *rev'd*, 591 F.2d 242 (3rd Cir.1979); *Belikoff v. McLaughlin*, 7 Pa.D. & C.3d 160 (C.P. Bucks Co.1977); *Degnan Chevrolet, Inc. v. Cocco*, 63 Pa.D. & C.2d 572 (C.P.Phila.Co.1973); *Duh v. Bethlehem's Globe Publishing Co.* (No. 2), 48 Pa.D. & C.2d 274 (C.P. Northampton Co. 1969); *Mumma v. Pomeroy's, Inc.*, 38 Pa.D. & C.2d 594 (C.P.Dauph.Co.1965); *Shaines v. R.C. Dun & Co.*, 8 Pa.D. & C. 597 (C.P.Phila.Co.1927). These cases are disapproved to the extent they conflict with the rule we announce today: a plaintiff in libel in Pennsylvania need not prove special damages or harm in order to recover; he may recover for any injury done his reputation and for any other injury of which the libel is the legal cause. *See* Restatement (Sec-

ond), *supra*, § 621 & Comments. Courts in libel cases should be guided by the same general rules regarding damages that govern other types of tort recovery.[9]

The order of the court en banc refusing to take off nonsuit is reversed; appellant to receive a new trial in accordance with this opinion; jurisdiction relinquished.

---

**9.** Of course, the First Amendment places outer limits on the recovery of punitive damages or presumed damages in excess of actual loss proven. *See Gertz v. Welch, supra* part 3. The availability of nominal damages in a defamation action after *Gertz* remains open to debate. *Id.* § 620 & Comments; *see Rimmer v. Colt Industries Operating Corp.*, 656 F.2d 323, 327 (8th Cir.1981) (an award of nominal damages to vindicate a legal right "is a common law tradition squarely cemented in American jurisprudence"). Interestingly, in a recent libel case this Court affirmed an award of $5,000 punitive damages where no compensatory damages had been awarded. *Laniecki v. Polish Army Veterans Association of Lucyan Chwalkowski,* 331 Pa.Super. 413, 480 A.2d 1101 (1984). The court noted, however, that the plaintiff proved a "cause of action" for compensatory damages.