371 A.2d 1002

**Robert J. DOMAN et al., Appellants,**

v.

**Burton S. ROSNER (at No. 304) and Roger D. Freeman, (at No. 305) Appellees.**

Superior Court of Pennsylvania.

Submitted June 17, 1976.

Decided March 31, 1977.

618

Bruce K. Doman, Perkasie, for appellants.

Gordon W. Gerber, Philadelphia, for appellees.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

VAN der VOORT, Judge:

At No. 893 February Term, 1969 in the court below, plaintiffs filed a complaint in trespass alleging that defendant Dr. Burton S. Rosner (Rosner) published defamatory matter regarding The Institutes for the Achievement of Human Potential (Institutes). The individual plaintiffs were directors of the Institutes, which is described in the pleadings as a non-profit organization

whose purpose was the aid and treatment of brain-injured children. Defendant Rosner at the time of the complaint was a professor of psychology at the University of Pennsylvania, who had become associated with the Institutes as an investigator in one of its projects, viz., a project to test the methods of treatment of brain-injured children used by the Institutes running from September 1, 1966 through August 31, 1967 and funded in part publicly and in part privately. The project was never fully completed however Rosner concluded his tasks by writing and issuing a "final report". It is this report, the contents of which are alleged to be defamatory to plaintiffs, together with a letter and various re-publishings of the material content of the "final report", which are the gravamen of plaintiffs' complaint. The basic contention of plaintiffs is that Rosner, in his "final report", libelled plaintiffs by stating that Doman and the Institutes, as to the project on which Rosner was working, had contradicted basic understandings regarding mutual goals and that the plaintiffs withdrew their commitment and agreement to cooperate on the project, which was a comprehensive study of certain treatment for brain-defective children. Rosner filed an answer denying libelous statements and containing new matter wherein he averred that the material now alleged to be libelous had been published in good faith, without malice, and that it was privileged matter in the public interest concerning conduct of public officials or figures. Some five years following commencment of this action, and supported by an extensive deposition of defendant and lengthy interrogatories of plaintiffs, together with additional exhibits, defendant moved for summary judgment. Therein defendant argued that the subject statements were not defamatory as a matter of law, that the statements were made about public figures engaged in a project of public interest, and that Rosner acted without malice. By Order dated September 26, 1975, the lower court granted summary judgment in favor of defendant.

Our courts have held that "a libel is a malicious publication, expressed either in printing or writing or by signs and pictures, which tends to blacken a person's reputation and expose him to public hatred, contempt, or ridicule, or injure him in his business, trade or profession; [citations omitted]". *Bogash v. Elkins*, 405 Pa. 437, 439, 176 A.2d 677, 678 (1962).

■ It has long been the law that it is the duty of the trial court, in the first instance, to determine whether the language or circumstances complained of have a defamatory meaning and would therefore be actionable. *Cosgrove v. Pane*, 408 Pa. 314, 182 A.2d 751 (1962), *Fox v. Kahn*, 421 Pa. 563, 221 A.2d 181 (1966), and *Miller v. Hubbard*, 205 Pa.Super. 111, 207 A.2d 913 (1965).

■■ When an action for libel has been brought the trial court by means of the pleadings, depositions, interrogatories and such other preliminary proceedings as are necessary or appropriate, must determine the character of the published material. Our courts have further held that "the question of whether the language used in the allegedly defamatory article can fairly and reasonably be construed to have the libelous meaning ascribed to it by plaintiffs is in the first instance a matter of law for the court; [citations omitted]", *Bogash v. Elkins, supra.*

Our courts have also held that:

"Procedurally, it is the function of the court in the first instance, to determine whether the communication complained of is capable of a defamatory meaning: . . . Restatement of Torts § 614(1) (1938). If the court determines that the statement is capable of a defamatory meaning, it is for the jury to determine whether it was so understood by the recipient . . . [citations omitted]" *Corabi v. Curtis Publishing Company*, 441 Pa. 432, 442, 273 A.2d 899, 904 (1971).

If the court decided "that the statement is capable of a defamatory meaning [then] it is for the jury to deter-

mine whether it was so understood by the recipient. . . ." *Corabi v. Curtis Publishing Co.*, at 441, at 273 A.2d 904, supra. If the alleged defamation is determined not to be so as a matter of law, then the case shall be terminated prior to its going to the fact-finder. *Redding v. Carlton*, 223 Pa.Super. 136, 296 A.2d 880 (1972), *Gresh v. Potter McCune Co.*, 235 Pa.Super. 537, 344 A.2d 540 (1975).

█ A review of the Record in this case reveals that the trial court did not err in finding that the published material was not capable of defamatory meaning.[1] From a review of the Record it is obvious that the parties were attempting to conduct a controlled study of the various methods of treatment of brain injured children administered by the Institutes to the end that the results might be compared to treatments of similar cases by other organizations, that the project fell through because of disagreements as to the method of making these tests and that Rosner was giving his opinion as to the reasons why the project fell through. Rosner's final report was required by the initial agreements.

Even if the published material was held to be capable of communicating a defamatory meaning, the defendant claims that the Institutes and its directors were public figures engaged in undertakings of public interest. Rosner claims that the material now alleged to be libelous

---

1. The nature of the alleged libelous statements even taken out of context were as follows:

(a) That the plaintiffs " 'withdrew their commitment to an essential, previously accepted condition', of a controlled study of the outcomes of various therapies . . .";

(b) That the plaintiffs abandoned a "written agreement achieved with other parties at much cost of time and energy";

(c) That the plaintiffs " 'withdrew their original agreement to the design' of a controlled study intended to test their theory and of a comprehensive study of their techniques"; and

(d) That the plaintiffs were guilty of "undercutting a proposed controlled scientific study of their methods by withdrawing after the federally and privately financed study already was in the final planning stages".

was published in good faith without malice. He contends that because of the public nature of the plaintiffs' work a statement made regarding their conduct of it is not actionable as defamatory unless actual malice can be proved. *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

■ The evidence in the Record is overwhelming in its showing that the Institutes is a public figure and that its work is of immense public interest. Judge KUBACKI'S findings from the Record in this regard are as follows:

". . . Its public figure was attested to by a proclamation issued by the Governor of Pennsylvania wherein he proclaimed the week of October 14, 1967 as Achievement of Human Potential Week and stated therein that the Institutes for Achievement of Human Potentials was then treating 2400 brain-injured children which was the largest number of brain injured children under active treatment by a single institution in the world.

"The names and positions of the individual plaintiffs appear in many of the articles written about the Institutes. They have made thousands of speeches and each have written several books and articles. There are publications and hundreds of books, articles, films and tapes which discuss the Doman-Delacato Treatment. The above described proclamation would also affect the public figure of the individual plaintiffs as directors of the Institutes."

■ The defense of privilege is founded upon public policy. In *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 451, 273 A.2d 899, 909, *supra*, our Supreme Court said:

"The basis of the defense of privilege is public policy: See, e. g., *Williams v. Kroger G. & B. Co.*, 337 Pa. 17, 10 A.2d 8 (1940). That is, 'conduct which otherwise would be actionable is to escape liability because

the defendant is acting in furtherance of some interest of social importance, which is entitled to protection even at the expense of uncompensated harm to the plaintiff's ·reputation:' *Montgomery v. Philadelphia,* 392 Pa. 178, 181, 140 A.2d 100 (1958); *Rankin v. Phillippe,* 206 Pa.Super. 27, 31, 211 A.2d 56 (1965); Prosser, The Law of Torts § 109, at 796 (3d ed. 1964). 'If [the interest thus favored] is one of paramount importance, considerations of policy may require that the defendant's immunity . . . be absolute, without regard to his purpose or motive, or the reasonableness of his conduct. If it has relatively less weight from a social point of view, the immunity may be qualified, and conditioned upon good motives and reasonable behavior:' Prosser, The Law of Torts § 109, at 796 (3d ed. 1964). [Footnote 9 omitted.]

In the case at hand we are not concerned with absolute privilege, rather we are concerned with a matter of qualified privilege. Where the communication is protected by a qualified privilege the absence of malice is presumed for the reason that the party publishing the communication is acting in furtherance of some overriding social interest. However, if the privilege is a qualified one and it is shown that the defendant acted with actual malice the qualified privilege falls. In other words, if it be shown that the publisher abused his qualified privilege he is no longer protected by it. The burden of "proving such abuse" is upon the plaintiff. It is the province of the court to determine whether as a matter of law that plaintiff can produce evidence which, if believed, is sufficient to prove an abuse of the qualified privilege. Cf. *Bon Air Hotel, Inc.,* 426 F.2d 858 (5th Cir., 1970) which cites *Wasserman v. Time, Inc.,* 138 U. S.App.D.C. 7, 424 F.2d 920 (1970). In the instant case the Institutes and its directors are engaged in work of broad and important public and social interest. There is no evidence that Rosner went beyond the scope of his du-

ties in issuing his final Report albeit the Report is critical of the plaintiffs. There is nothing in the evidence to indicate that the Report goes beyond fair comment in such a matter of great social interest. There is nothing to indicate that Rosner referred facts or directed his language to other than those having similar concern to his. Malice may be shown by proof that the published material is false and that the publisher knew it to be so or that he acted with reckless disregard to the truth or falsity of the matter. There is no evidence to indicate any knowledge on the part of Rosner that the material which he published was false if in fact it was or that he recklessly disregarded the truth or falsity of the matter. We find no evidence upon which there could be a proper finding that Rosner abused his privilege from which abuse malice might be inferred.

Similarly, at lower court No. 1441 July Term, 1968, these plaintiffs filed a complaint in trespass alleging that defendant Roger D. Freeman caused to be published matter claimed to be defamatory. An answer and new matter was filed which denied the allegations of plaintiffs in much the same way as had defendant Rosner. Subsequently this defendant filed a motion for summary judgment, arguing no defamation, privilege and lack of malice, as had the defendant in the related action. With the benefit of an extensive deposition of Freeman, presumably together with the additional discovery made in the related action, the lower court also granted Freeman's motion for summary judgment in his favor on September 26, 1975.

The facts as found by the court below which we adopt are as follows:

"... The executive committee of the American Academy of Cerebral Palsy had appointed and directed a subcommittee to prepare a report concerning the Institutes. The defendant was appointed secretary of and consultant to this subcommittee. He was not asso-

ciated in any other way with the American Academy of Cerebral Palsy. The members of this subcommittee, five in all, were all professionals in the field of health and medicine and they consulted with other professionals in this field.

"The work product of this subcommittee was a draft on an 'Official Statement' entitled the Doman-Delacato Treatment of Neurologically Handicapped Children (Exhibit 'A' of the Complaint). This Official Statement was printed in a publication known as the Archives of Physical Medicine and Rehabilitation in its issue of April 9, 1968. The Complaint alleges this article to be defamatory to the plaintiffs. The Complaint also had twelve other exhibits attached to it, allegedly defamatory to plaintiffs, which were copies of articles printed in other media totally unrelated to any activity of the defendant.

"The defendant read almost all of the many articles and documents of reference listed in the footnotes of Exhibit 'A.' The five members of the subcommittee informally agreed to make this report available to the executive committee and to deliver it to the secretary of that committee [Executive Committee] of the American Academy for Cerebral Palsy. The defendant never signed the statement. He had nothing whatsoever to do with disseminating this article to any publication. He later learned, after delivering the 'Official Statement' to the secreatry [sic] that it was to be printed in the official journal of the American Academy for Cerebral Palsy at the direction of its executive committee. The article itself was approved by seven recognized American and Canadian organizations dealing with retardation, rehabilitation, and learning disabilities of persons including children."

For the reason that again, the Institutes and its directors are public figures engaged in undertakings of public interest and whatever connection Freeman had

with the "Official Statement" the communication, while critical of the plaintiffs, was protected by a qualified privilege. Whether or not the material published in the "Official Statement" contained defamatory matter or whether or not Freeman took sufficient part in the publication of it, to be held responsible for its content need not be decided.

As in the case against Rosner, there is no evidence that Freeman abused his qualified privilege. There is no evidence to indicate that Freeman had any knowledge that the material published by the American Academy for Cerebral Palsy was false, if in fact it was, or that he recklessly disregarded the truth or falsity of the matter. Here again, we find no evidence upon which there could be a proper finding that Freeman abused his privilege from which abuse malice might be inferred.

As to the twelve other publications which were copies of articles printed in other media and concerning which the plaintiffs complained, there was no evidence that Freeman took any part in the publication of these other twelve articles.

Affirmed.

HOFFMAN and SPAETH, JJ., concur in the result.