**Nicholson v. Kelly**

*Paul McCardle*, for plaintiff.
*John Jay Myers*, for defendant.

WOLFE, *P.J.*, May 14, 1985—In plaintiff's defamation action for libel the jury awarded plaintiff $30,000 general damage and $20,000 punitive damages.

A timely motion for judgment n.o.v. or new trial was filed by defendant. We have reviewed the record and have studied the briefs and conclude we erred in not granting defendant's motion for directed verdict on the issue of conditional privilege in defendant.

Plaintiff, prior to his employment termination, was a materials and machine inspector for Exxon Research and Engineering Company (Exxon) with duties of inspecting the equipment for the company.[1] Defendant J.P. Kelly likewise was employed by Exxon as a senior regional material inspector and as such is superior in rank to plaintiff on the corporate ladder.

The facts giving rise to the action are not in dispute. Plaintiff's cause of libel emanates from plaintiff's exhibit no. 17 which has taken on the nomenclature of the "Kelly Memo," a reference to the

---

1. Exxon Research and Engineering Company is a wholly-owned subsidiary of Exxon Corporation.

memorandum defendant wrote to his superior, A. W. Hanggeli, on December 6, 1982, in this manner:

"INTER-OFFICE CORRESPONDENCE
PRIVATE
CONFIDENTIAL
For The Personal Use of The Addressee
Date 12/6/82

| To<br>A. W. Hanggeli | Reference EEI File KH13-Rev 1<br>MK P. O. 49-50-100207-01 |
|---|---|
| From<br>J. P. Kelly | Subject INSPECTION COVERAGE AT GENERAL ELECTRIC IN ERIE, PENNSYLVANIA |

"The following summarizes telephone conversations between myself and Mr. G. Arias, Cerrejon Project Engineer (Railroad). Mr. Arias represents Exxon's partner, Carbocol, in the Cerrejon Coal Project, and is a member of the Project Management Team domiciled in Boise, Idaho.

"The subject conversation is the conclusion of Mr. Arias' observation of the ERF Inspector, Mr. W. Michelson, during functional testing of four 3600 HP railroad locomotives at General Electric in Erie, Pennsylvania, the week of November 15, 1982. Basically Mr. Arias was extremely critical of the inspector's actions during functional testing and his lack of basic knowledge of the equipment being tested. Reportedly, the inspector displayed an arrogant attitude in a defensive effort to overcome his obvious lack of experience and knowledge of such equipment and common testing in a timely manner.

"Mr. Arias further advises that during track functional testing the inspector devoted little time ob-

serving the test, monitoring personnel, and incidental items such as cab air conditioners, minor deviations of air pressure gages [sic] and defective painting occupied the majority of his time. 'He devoted little or no time to the performance and functionability of the locomotives.'

"Subsequent to the above conversation, I spoke with the contractor's engineering representative who was also present during the locomotive testing, and whose observations of the inspector's actions generally parallels [sic] those of Mr. Arias.

"It should be noted that the writer was not present during the referenced inspection visit and cannot verify the reported actions of our inspector.

"We regret that performance of this type was exercised by one of our inspectors. Consequently, we request that in the future when an inspector is assigned to conduct inspection activities on behalf of this project, consideration be given to his qualifications in an effort to prevent a recurrence of such incidents.

"If you have any questions or comments on this matter, contact me at Burlingame, California, on phone 415/579-4162.

"JPK/njw

"cc:C.M. Stewart
 R. Herkt
 D. Dankos"

The parties' employer is primarily in the business of research and engineering which necessitates the inspection of equipment on different projects in which Exxon has contracted. The particular project giving rise to plaintiff's action was a joint one between Exxon and Carbocol for the exploration of coal in the northern part of Columbia, South America. Defendant was the project inspector-coordinator for this "Cerrejon Coal" project. In this

regard defendant was responsible for the quality of all equipment that was purchased or manufactured for the project. Essentially, defendant had the responsibility of the entire inspection program, which he described as being the "up-stream responsibility, mid-stream responsibilities, and down-stream responsibilities." In this regard defendant had responsibility for all order assignments and for the purchase, assembly and inspection of equipment on any particular project. Defendant was required to work through a regional inspector who, in turn, would assign an inspector to the project at hand, which, in this case, was the manufacture of four locomotives in Erie, Pa. Defendant, in following his duties, contracted Mr. Bankos, a regional inspector for Exxon, who, in turn, directed defendant to assign the Erie project inspection to plaintiff. This time frame of the project was referred to by defendant as a mid-steam responsibility, and thereafter his responsibilities on the project were categorized as down-stream. Defendant's duties continued on the down-stream activities if there were any problems arising from the inspection in that the project did not meet specifications or a problem with the time element under the contract, etc. If problems arose defendant was responsible for correcting them.

Defendant, in turn, was required to report to Mr. Herkt, who was a manager for Exxon, and to his superior, A.W. Hanggeli. Also in the line of command of reporting the inspection activities was C.M. Stewart, who had replaced R.J. Henning as a project director.[2]

---

2. See defendant's exhibit no. 7 which is styled "Cerrejon Coal Project Off-shore Organization Intercor Project Management Team."

According to defendant's testimony, after the inspection of the locomotives in Erie, he received a telephone call from Mr. Laughlin who called him to relate a complaint he received about plaintiff's inspection method from Mr. Gustavo Arias.[3] Thereafter, defendant, in order to verify the information concerning the complaint, called Eugene Tonda who was connected with the Morrison-Knudsen as a railroad engineer which was connected with the project. Subsequently, defendant went to Mr. Herkt who was not immediately available, thus defendant then sought Mr. Stewart who was Mr. Herkt's superior on the organizational corporate chart, with whom he discussed the conversation he had with Mr. Arias concerning the inspection complaint. Defendant thereafter telephoned A.W. Hanggeli with whom he conveyed the complaint and who at the time was in the presence of Mr. Dankos when the phone call was made. At the request of Mr. Hanggeli, defendant composed the "Kelly Memo" and mailed it to Mr. Hanggeli in New Jersey.

A libel is a malicious written publication which tends to blacken a person's reputation and to expose him to public hatred, contempt or ridicule, *or injure him in his business, trade or profession.* Agriss v. Roadway Express, Inc., 334 Pa. Super. 295, 483 A.2d 456 (1984). (Emphasis added.)

Initially, it is for the court to determine if a particular publication is capable of defamatory meaning as a matter of law and, if so, the issue must be committed to the jury for the balance of the cause. Beckman v. Dunn, 276 Pa. Super. 527, 419 A.2d 583 (1980). Here, we determined that the "Kelly

---

3. Mr. Arias was connected with the "Carbocol" end of the project and represented the client of Exxon. "Carbocol" is an acronym for Columbian Resources Corporation.

Memo" to Mr. Hanggeli subjected plaintiff to injury in his trade or profession. In our view the memo clearly and categorically depicts plaintiff as being incompetent in his trade or a profession as a materials insector in the business world.

The memo was limited in scope to the corporate structure of personnel and the execution and publication thereof followed corporate procedure. There is utterly no evidence this inter-office correspondence was communicated to other than A.W. Hanggeli, C.M. Stewart, R. Herkt, and D. Dankos. This personnel all had a proper interest in the corporate inspection of the Erie project.

A communication is privileged when it is made on a proper occasion, for the proper motive, in a proper manner and based upon reasonable cause. Baird v. Dunn & Bradstreet, Inc., 446 Pa. 266, 285 A.2d 166 (1971). If the communication is made by one having an interest in the subject matter thereof to another who shares an interest in the subject matter, the occasion is conditionally privileged. Baird v. Dunn & Bradstreet, supra. It is a question of law for the court to determine whether or not the communication is subject to a privilege defense. Agriss v. Roadway Express, Inc., supra.

Abuse of a conditional privilege is indicated when the publication is actuated by malice or negligence, Baird v. Dunn & Bradstreet, Inc., supra, is made for a purpose other than that for which the privilege is given, Rankin v. Phillippe, 206 Pa. Super. 26, 211 A.2d 56 (1965), [is made] to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege, or includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose.

Legal malice consists of a wrongful act, done intentionally without just cause or excuse. Corabi v.

Curtis Publishing Company, 441 Pa. 432, 273 A.2d 899 (1971), or is generated from reckless or wanton disregard of another's rights, Purcell v. Westinghouse Broadcasting Company, 411 Pa. 167, 191 A.2d 662 (1963). Plaintiff has the burden of proving an abuse of a conditional privilege, 42 Pa.C.S. §8343(a)(7).

In Rankin v. Phillippe, supra, the court wrote this:

"Where conditional privilege is evidenced, as here, from plaintiff's case, plaintiff will be nonsuited unless he can prove the abuse of that privilege. A nonsuit was granted because no evidence was presented by appellant from which the jury could reasonably find that there was an abuse of the conditional privileged occasion. When an abuse of the privilege is raised the burden is on appellant to prove it."

In the instant case we find no evidence or inference of evidence defendant abused his conditional privileges in reporting to his corporate superiors. Plaintiff points to a telephone conversation he had with defendant wherein defendant taunted him and expressed his suprise he was still with the company and that "Hanggeli" had now sufficient evidence to discharge him. At this juncture we hold we fell into error in defining malice as applied to defamation cases.

We now hold our instructions to the jury in this regard were totally incorrect.

In Doman v. Rosner, 246 Pa. Super. 616, 371 A.2d 1002 (1977), the court held:

"Malice is shown by proof that the published material is false and that the publisher knew it to be so or that he acted with reckless disregard to the truth or falsity of the matter."

To the same effect is Berg v. Consolidated Freightway, Inc., 280 Pa. Super. 495, 421 A.2d 831 (1980), and Raffensberger v. Moran, 336 Pa. Super. 97, 485 A.2d (1984).

In Hepps v. Philadelphia Newspapers, Inc., 506 Pa. 304, 485 A.2d 374 (1984), the court in addressing the definition of malice in defamation cases wrote:

"The publisher's hatred, spite, hostility, or deliberate intention to harm plaintiff is not sufficiently probative of his knowledge of falsity or awareness of probable falsity so as to allow its admissability where 'actual malice' is an issue, but once established, the elements heretofore enumerated would be admissable (Citations omitted.) As has been suggested, such testimony would invite a jury to improperly find a defendant liable where he acted with a guilty heart rather than a guilty mind. Also, it is axiomatic that a publisher's failure to investigate in itself is insufficient to establish 'actual malice.' "

Instantly, defendant was under a duty to report to his superiors and, thus, enjoyed a qualified privilege as a matter of law in writing the memo. It is plaintiff's suspicion and speculation the memo reached the outside world. There is utterly no proof of this. This is plaintiff's suspicion and surmise based upon his conclusion that he has been unable to obtain a job after his discharge.[4]

Here, there is no evidence or inference of evidence defendant acted without just cause or in a reckless or wanton disregard of plaintiff's rights. In-

---

4. Plaintiff was discharged by reason of a downswing in Exxon's business, according to the testimony of John Leibold, along with many others who either involuntarily or voluntarily terminated their employment for this reason.

deed, defendant was under a corporate duty to report the incident to his superior and did so upon his superior's request. Defendant flatly denied any personal demeaning conversation with plaintiff; however, assuming he did as plaintiff testified, this does not corroborate plaintiff's duty to meet plaintiff's burden of proof defendant abused privilege. Hepps v. Philadelphia Newspapers, Inc., supra.

Malice, in defamation cases, is not to be equated with a common-law malice definition. It is error for the court to instruct the jury that a qualified privilege is lost if defendant acted negligently or recklessly. Beckman v. Dunn, supra.

In Rankin v. Phillippe, supra, the court unequivocally states:

"The nonsuit was granted because there was no abuse of a conditional privileged occasion. If the occasion of the publication in question was conditionally privileged and there was no abuse of the occasion, there is no liability regardless of the ill will of the publisher. If the publication is made for a proper purpose the fact that the publication is inspired in part by resentment or indignation at the supposed misconduct of the person defamed does not constitute an abuse of the occasion."

Instantly, there is not one single shred of evidence defendant had any reason to doubt the credibility of the information in the memorandum he composed, which was a mere recitation initially of what defendant was informed by third parties, to which he added his concern that in the future consideration be given to the inspector's qualifications. We cannot conclude and find as a matter of law there was no abuse of a qualified privilege in defendant in the composition and publication of the "Kelly Memo."

622

Because we grant defendant's motion for judgment non obstante veredicto, we do not resolve the motion for new trial and enter the following

## ORDER

And now, this May 14, 1985, defendant's motion for judgment non obstante veredicto is granted.