**Mark D. KATZ, Plaintiff,**

v.

**William GLADSTONE, Defendant.**

**Civ. No. B–85–672(JAC).**

United States District Court,
D. Connecticut.

Oct. 30, 1987.

Ronald G. Wohl, Finkelstein, Bruckman, Wohl & Rothman, New York City, for plaintiff.

Frederic S. Ury, Rubenstein & Ury, Westport, Conn., for defendant.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

JOSÉ A. CABRANES, District Judge:

### I.

### BACKGROUND

Plaintiff Mark Katz, a citizen and resident of Pennsylvania, is the author of a book entitled *Custer in Photographs*, published in 1985. Defendant William Gladstone, a citizen and resident of Connecticut, reviewed the book in a number of periodicals published in the United States. On December 12, 1985, plaintiff filed this diversity action, alleging that defendant's reviews were false and defamatory. Defendant answered and counterclaimed for defamation, based upon a series of letters written by plaintiff to editors and publishers concerning defendant's review. Defendant has moved for summary judgment on plaintiff's initial complaint. The resolution of the issue raised by the complaint has significant implications for the range of permissible criticism and, therefore, for the public's access to knowledgeable evaluations of works of history and literature.

Defendant's review, *see* Complaint (filed Dec. 12, 1985) ("Complaint"), Exhibit A, criticized plaintiff's book on various grounds, relating mainly to alleged factual inaccuracies and to the book's limitations as a re-

source for scholarly readers. Since the review is not long, and its language is of the essence to this action, it is quoted in full, except for the reviewer's introductory quotations from the book itself, which indicate the author's ambitions to "evaluate" and "analyze," as well as collect, Custer photographs.

Mr. Katz has amassed 155 photographs of George Armstrong Custer....

The text for this impressive collection is virtually nil. The printed matter besides the chronology and photo caption[s] consists of one page of Acknowledgement, Preface, Forward but the Introduction is a page and a half of text. There is also one page of the Custer Service Record.

The Official Service Record of George A. Custer is in the front of the book and a Custer Chronology at the end of the book. This service record is not incorporated into the chronology at the end of the book. One has to flip from the service record in front to the chronology at the end of the book to make it meaningful. There are many mistakes in the chronology.

Seventy[-]three percent of the photographs are not listed in the chronology. There is no analysis of the photographs (i.e. there are four paragraphs of analysis for the 155 photographs).

Mr. Katz informs the reader of the 36 different photographers who photographed Custer on 72 different occasions. There is no listing of the Custer photographers, so I made my own list and came up with only 25 photographers instead of the 36 as mentioned by the author.

The first photograph K–1 (i.e. K for Katz) set the tone for the book. This is a photo of a young Custer holding a cased image. The caption does not answer the viewer[']s thought as to who is in the cased image. The description pertaining to this image is in the Introduction and not as part of the caption of the photo. Mr. Katz describes the love struck Custer "rest[ing] his head on his right

hand." Custer is shown resting his head on his left hand. This might cause confusion to the viewer. Since this is an ambrotype the figure is reversed. This comment should be part of the analysis. This same photo is used as the back photo of the dust cover. This photo has Custer resting his head on his right hand, opposite of the K–1 photo.

The third photo, K–3, has Custer in a West Point cadet uniform with a date one month after he graduated. The caption states he is a cadet lieutenant. Custer is at this time a second lieutenant in the United States Army and would not be wearing a cadet uniform. The uniform in this photo, K–3, is not of a cadet lieutenant but the same one described as a "cadet" in the previous photo, K–2. The K–3 photo being an ambrotype is also reversed and this is not mentioned in the caption.

Some photographs captioned Custer taken by Brady in New York are shown with a Brady Washington imprint and visa versa with no explanation. The dates on some of the photographs as listed are questionable and are not the same date as given in the chronology.

In summation: Mr. Katz has gathered 155 photographs of George Armstrong Custer. This is impressive. His captions and documentation leave much to be desired. There is virtually no analysis or text of the photographs themselves. The scholar cannot use the book with ease for there is no index, footnotes or bibliography. I found too many errors in what has been presented and too many questions unanswered. What Mr. Katz has done is amass 155 Custer photographs.

The complaint alleges that defendant's review, widely published in the United States, was "false and defamatory." Complaint at ¶ 18. The Complaint also states that the review was "published maliciously and with the intent to injure the plaintiff in his profession and to expose plaintiff to public contempt and ridicule." *Id.* at ¶ 19.[1] Plaintiff claims that defendant published

---

1. The Complaint also alleges that a letter defend- ant sent to the Gettysburg National Military

the reviews knowing them to be false, or with reckless disregard of their truthfulness, *see id.* at ¶ 25, and with "malice and ... an express design to injure the publication of the Book and thereby, the plaintiff himself." *Id.* at ¶ 23. The plaintiff reads the reviews as containing the innuendo, understood by the public, that "the plaintiff was not qualified as a historian of the works of General Custer." *See id.* at ¶ 24. Defendant allegedly wrote his reviews with the intention of "getting even" with the plaintiff. *Id.* at ¶¶ 11, 13.

Defendant's motion for summary judgment rests on the ground that there are no disputed issues of material fact and that "[t]he Review is not reasonably capable of defamatory meaning." Memorandum of Law in Support of Defendant's Motion for Summary Judgment (filed Oct. 17, 1986) ("Defendant's Memorandum") at 4. Defendant claims that the review "makes no reference to the plaintiff's abilities except as author of the book." *Id.* at 4–5. Defendant also argues that the review is protected by the constitutional privilege of "fair comment" because it "is an expression of pure opinion." *Id.* at 5. Defendant finally argues that he is protected "by the absolute defense of truth," basing this argument on plaintiff's admission that "there are many errors in the book." *Id.* at 5.

## II.

### THE MOTION FOR SUMMARY JUDGMENT

#### A. *The Standard for Summary Judgment*

Upon a motion for summary judgment, in libel actions as in others, the court must first determine whether there is a genuine dispute about any issue of material fact *See, e.g., Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As recently clarified by the Supreme

Court, the standard of materiality requires that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will preclude the entry of summary judgment." 106 S.Ct. at 2510. "... [R]ule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). A factual dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and the nonmoving party "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby,* 106 S.Ct. at 2510; *See Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985) (per curiam) (noting that the nonmoving party may not rely upon mere speculation or conjecture as to the true nature of the facts in order to overcome the motion).

#### B. *The Applicable State Law*

A court of the United States sitting in diversity jurisdiction must look to the law of the forum state for the rules governing the choice of law. *See Klaxon Co. v. Stentor Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). It has been held that a Connecticut court, in an action for defamation by a multi-state publication, would look to the substantive law of the plaintiff's domicile. *See Hazlitt v. Fawcett Publications,* 116 F.Supp. 538, 539 (D.Conn.1953); *Dale System, Inc. v. Time, Inc.,* 116 F.Supp. 527, 529–30 (D.Conn. 1953).[2] The parties do not contest the ap-

Park regarding the book was similarly "false and defamatory and [was] published maliciously and with the intent to injure the plaintiff in his profession and to expose plaintiff to public contempt and ridicule." According to plaintiff that letter is now missing, however. *See* Plaintiff's Affidavit at ¶¶ 18–21. Since plaintiff nowhere

in his opposition affidavits or exhibits provides the court with any indication of the substance of this allegedly defamatory letter, the court addresses itself solely to the reviews.

**2.** This rule comports with Connecticut's general approach to choice of law questions which, at least until recently, could be characterized as

plication of the law of Pennsylvania, plaintiff's domicile. *See* Plaintiff's Supplemental Memorandum of Law (filed April 8, 1987) ("Plaintiffs Supplemental Memorandum") at 2; Supplemental Memorandum of Law in Support of Defendant's Motion for Summary Judgment (filed April 27, 1987) ("Defendant's Supplemental Memorandum") at 1 (not disputing applicability of Pennsylvania law, but stating that "the Review written by the Defendant did not defame the Plaintiff and is not capable of defamatory meaning under Connecticut or Pennsylvania law"). The applicable state law of defamation is, in any event, necessarily constrained by federal constitutional concerns. *See Buckley v. Littell*, 539 F.2d 882, 888 (2d Cir.1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977).

### C. *Standards for Relief*

■ Under Pennsylvania law, "[a] libel is a maliciously written or printed publication which tends to blacken a person's reputation or to expose him to public hatred, contempt, or ridicule, or to injure him in business or profession." *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 441, 273 A.2d

899, 904 (1971). Another way of putting the standard is that "a communication is defamatory if it tends so to harm the reputation of another as to lower him in the esteem of the community or to deter third persons from associating or dealing with him." *Id.* at 442. Truth is an absolute defense to a defamation action, but even where a publication is both defamatory and false, a defendant may also raise the defense of privilege, if he is acting in furtherance of some interest of social importance. *See Hepps v. Philadelphia Newspapers, Inc.*, 506 Pa. 304, 314–15, 485 A.2d 374, 379–80 (1984), *rev'd on other grounds*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986).

■ Under Pennsylvania statute, *see* 42 Pa.C.S.A. § 8343(a), the plaintiff in a defamation action has the burden of proving the defamatory nature of the communication, publication by the defendant, applicability of the communication to the plaintiff, understanding by the recipient of the defamatory meaning and of its intended application to the plaintiff injury and, where applicable, abuse of the conditional privilege of fair comment. The statute places upon defendant the burden of proving truth,[3] and,

---

"traditional." *Schirm v. Auclair*, 597 F.Supp. 202, 205 (D.Conn.1984). In tort actions, those rules point to the law of the place where the injury occurred. *See Gibson v. Fullin*, 172 Conn. 407, 411, 374 A.2d 1061, 1064 (1977); *Bailey Employment System, Inc. v. Hahn*, 655 F.2d 473, 476 (2d Cir.1981). The logic of the choice of law rule in defamation actions is that since the injury to be redressed is an injury to plaintiff's reputation, the locus of the injury is plaintiff's domicile.

The "traditional" Connecticut choice of law rules, characterized as "simple but rigid" by two commentators, Silver and Twardy, The Connecticut Torts Conflict of Law Rules: A Proposal for Change, 57 Conn.Bar.J. 236 (1983), are often admirable for their clarity, predictability and, in cases like the one at bar, their common sense. They avoid the scholasticism that in other jurisdictions has driven conflicts law into a state of turmoil, "leaving the body of conflicts of law with a remedy every bit as distressing as the disease it was designed to cure." Brilmayer, Interest Analysis and the Myth of Legislative Intent, 78 Mich.L.Rev. 392 (1980).

Although the Connecticut courts are engaged in "modernizing" their choice of law doctrine in favor of the approach of the Restatement (Second) of Conflicts of Laws, *see, e.g., O'Connor v. O'Connor*, 201 Conn. 632, 519 A.2d 13 (1986); *Simaitis v. Flood*, 182 Conn. 24, 437 A.2d 828

(1980); *Halstead v. United States*, 535 F.Supp. 782 (D.Conn.1982), *aff'd sub nom. Saloomey v. Jeppesen & Co.*, 707 F.2d 671 (2d Cir.1983); *De-Fourneaux v. Sturm, Ruger & Co.*, 503 F.Supp. 2 (D.Conn.1980), *aff'd*, 639 F.2d 768 (2d Cir.1980), *cert. denied*, 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981), Connecticut has not yet "discard[ed] lex loci in all of its manifestations." *O'Connor v. O'Connor*, 201 Conn. at 648. Rather, it has chosen to "incorporate the guidelines of the Restatement as the governing principles for those cases in which application of the doctrine of lex loci would produce an arbitrary, irrational result." *Id.* at 650. We believe, as indicated above, that the traditional Connecticut choice of law rule in defamation cases does not produce an irrational, arbitrary result—at least in this case. We therefore consider it good law and apply it.

**3.** In *Philadelphia Newspapers v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 1559, 89 L.Ed.2d 783 (1986), considering the Pennsylvania statute, the Supreme Court held that the burden of proof on falsity must be placed upon a private-figure plaintiff "at least where a newspaper publishes speech of public concern." The Court did not reach the question whether the same standard would apply to a private-figure plaintiff suing a nonmedia defendant. *See id.* at 1565 n. 4.

where the defense of privilege is raised, the privileged character of the communication and that the subject matter was of public concern. *See* 42 Pa.C.S.A. § 8343(b).

The right to recover in a libel action under Pennsylvania law is not in the first instance determined by the author's intentions or motivations;[4] the first necessary element for any recovery is defamatory meaning of the words themselves. As Pennsylvania's highest court has stated:

> in an action for libel, the liability of the defendant is not dependent upon the intention of the author.... The test is the effect the article is fairly calculated to produce, the impression it would normally engender in the minds of the average persons among whom it. is intended to circulate.

*Corabi v. Curtis Publishing Co.*, 273 A.2d at 906–7.

■ Thus, to prevent entry of summary judgment, plaintiff must show first that the review is capable of defamatory meaning and, if it is, that there is a genuine dispute about the facts material to establishing the truth or falsity of any defamatory statement. If it is necessary to reach the defense of privilege, and defendant is able to carry his burdens with respect to raising that defense, plaintiff will have to show sufficient evidence to go to a jury indicating that the defendant abused that privilege.

Plaintiff and defendant dispute a number of factual issues: the motivations of defendant in publishing an unfavorable review of plaintiff's book, the qualifications of defendant as an authority on Civil War photography and, at least in conclusory terms, whether in fact the book contains the errors referred to by defendant in his review. Before the court reaches the question whether these are genuine disputes about material facts, however, it must address the threshold question whether the review is capable of a defamatory interpretation. *See Agriss v. Roadway Exp., Inc.*, 334 Pa.Super. 295, 304–05, 483 A.2d 456, 461 (1984).

**4.** The author's intentions and motivations may, however, be relevant to whether he may invoke

### 1. The Absence of Defamatory Content

■ Under Pennsylvania law, the threshold question of whether the review is capable of defamatory meaning is for the court to decide as a matter of law. *See Doman v. Rosner*, 246 Pa.Super. 616, 621, 371 A.2d 1002, 1005 (1977). To determine whether the review is capable of a defamatory meaning, the court must examine it in its entirety, and consider the effect it is fairly calculated to produce among average persons among whom it is intended to circulate. *See Thomas Merton Center v. Rockwell International Corp.*, 497 Pa. 460, 465, 442 A.2d 213, 216 (1981), *cert. denied*, 457 U.S. 1134, 102 S.Ct. 2961, 73 L.Ed.2d 1351 (1982). Having made the necessary examination, this court finds nothing in the review that is capable of defamatory meaning.

It is true, of course, that the review is critical, although it also says the collection of photographs amassed by the author is "impressive." The criticism, however, is of the book itself and contains no attacks, libelous or otherwise, on plaintiff himself, as opposed to the work. Not even defendant's closing passage "in summation" speaks explicitly of the author's abilities, though it does suggest that the audience for which the book is suited is not a scholarly audience.

■ Plaintiff argues correctly, however, that the court must also consider whether the review is defamatory by innuendo. Defamation by implication and insinuation, as well as explicit language, can provide a basis for recovery for defamation, but only if such innuendoes are present. When the plaintiff attempts to show defamation by innuendo, "[i]t is the duty of the court ... to determine whether the language used ... could fairly and reasonably be construed to have the meaning imputed in the innuendo. If the words are not susceptible of the meaning ascribed to them by the plaintiff and do not sustain the innuendo, the case should not be sent to the jury." *Richwine v. Pittsburgh Courier Publish-*

the privilege of fair comment. *See* discussion below, at Section 3.

*ing Co.,* 186 Pa.Super. 644, 648, 142 A.2d 416, 418 (1958).

Plaintiff argues that the innuendo contained in defendant's review is that plaintiff "is not a qualified historian of the life of General Custer." Plaintiff's Supplemental Memorandum at 7. Assuming, *arguendo,* that a direct statement of this sort would be defamatory, as injurious to plaintiff's professional reputation and as tending to discourage people from dealing with him in that capacity, we must determine whether the words defendant actually wrote are susceptible of interpretation to mean that plaintiff "is not a qualified historian of the life of General Custer."

What the defendant has actually written is that the book contains certain specific errors and that the number of those errors, as well as other features of the book (*e.g.,* lack of footnotes and bibliography), make it of limited use to scholars in the field. Since no one but the author is mentioned as the person responsible for the errors, or for the omission of footnotes, it is fair to say that these observations about the book also reflect upon its author. But what do they reflect? That the author is capable of making mistakes, and that he has chosen to produce a book of one sort rather than of another sort, or perhaps that he has not achieved his own ambitions for the book. It is a distortion of the words actually written to find in them the accusation that the author is not *qualified* to produce a book of the sort he produced, or to do so with fewer errors, or even to produce a book of the sort which the reviewer would have preferred. A jury could not reasonably conclude that the words written include the meaning ascribed to it by the plaintiff.

It would be well at this juncture to sample some language that has been held capable of defamatory meaning, and some that has been held incapable of it. There seem to be relatively few cases considering specifically the defamatory meaning of book reviews, and none directly on point decided under Pennsylvania law.

Plaintiff points to the case of *Preveden v. Croation Fraternal Union of America,* 98 F.Supp. 784 (W.D.Pa.1951), in which the defendants characterized their allegedly defamatory articles about an author and his book as "reviews." The court rejected that characterization, however, *see* 98 F.Supp. at 786, and denied a motion to dismiss which was grounded in the claim that the language was not libelous. But the language in question referred to the author as a "low-down soul," as well as to the book as "teeming with ugly words, of which even a mule driver would be ashamed," and alleged that the author was suing the defendants in order to raise money to publish the book. *See id.* The articles in question in *Preveden* are clearly distinguishable from the review in question here, for they made direct attacks upon the author.

It may be instructive to look to a Pennsylvania decision in the somewhat analagous situation of a letter evaluating the work of a candidate for reappointment to a teaching position at a college. In *Baker v. Lafayette College,* 350 Pa.Super. 68, 78, 504 A.2d 247, 252 (1986) (Spaeth, J. dissenting), *aff'd,* —— Pa. ——, 532 A.2d 399 (1987), the letter of evaluation characterized the candidate's attitude toward students as "almost cavalier ... *i.e.* no regular office hours, no outside assignments, a general attitude that the best way to build a program is to give high grades." The letter went on to describe the work of the candidate's students (which was taken to reflect upon the candidate's teaching) as "ordinary at best," and the candidate as generally unsuited to the kind of institution at which he was being considered. The court analyzed this letter as partly a statement of opinion, and partly statements of a factual nature. As to the former, it noted that "statements of opinion without more are not actionable" unless plaintiff can show that the "statement of opinion may 'reasonably be understood to imply the existence of undisclosed facts justifying the opinion,'" which plaintiff in that case could not. *Id.* (quoting *Beckman v. Dunn,* 276 Pa.Super. 527, 419 A.2d 583 (1980)). In affirming the trial court's determination that the factual statements also were devoid of defamatory

meaning, the appellate court noted the letter's mild tone: while it was "not exactly laudatory," it was not "of a nature 'to lower [the candidate] in the estimation of the community' in a way that 'necessarily involves the idea of disgrace.'" *Id.* It seems to this court that much the same can be said about the nature, tone and content of the review under scrutiny in this case as was said about the letter in *Baker* and the same conclusion reached.

As the plaintiff has himself stated the test of defamatory meaning, it is "whether the article reflected upon the *character* of the person at whom it is directed in such manner as to bring him into public ridicule, hatred or contempt." Plaintiff's Supplemental Memorandum at 3 (emphasis added). Taking the words of the review "in the sense that fairly belongs to them," *Richwine v. Pittsburgh Courier Publishing Co.*, 142 A.2d at 418, they cannot be reasonably construed as libelous of plaintiff, in the sense they tend to "blacken" his reputation or subject him to public ridicule. Indeed, the language of this review is tame and completely impersonal.

Perhaps some comments about a work are capable of defamatory meaning about its author. It has been so held when a publisher announced the discontinuation of the sale of a book because it was "trash," *see Conniff v. Dodd, Mead & Co.*, 593 F.Supp. 266, 270 (S.D.N.Y.1984), and when a review warned that its subject was a "potentially dangerous book." *See Joseph v. Xerox Corp.*, 594 F.Supp. 330, 332 (D.D.C.1984). However the innuendos involved in these cases at least arguably call into question the character of the author. The same cannot be said about assertions of factual inaccuracy or inappropriateness of a book to a given audience. If such language is capable of defamatory meaning, it is difficult to imagine what kind of review, except an unreserved "rave," would not be subject to harrassing law suits.

 Furthermore, this is not a close case: the latitude for criticism of works of literature, history and art must be at least this great if learning is to continue, and greater if it is to flourish. Although we go on to discuss defendant's alternative arguments in support of the motion for summary judgment, we wish to emphasize the primary basis for our decision: that reviews of this sort—critical, but impersonal; addressed to the character of the work rather than the character of the author—are not defamatory as a matter of law. To hold otherwise would deprive the public of an invaluable resource and the responsible critic of his very voice.

## 2. The Defense of Truth

Even if defendant's review were capable of defamatory meaning by innuendo or otherwise, truth would nevertheless be a complete defense to this action. *See, e.g., Pierce v. Capital Cities Communications, Inc.*, 576 F.2d 495, 507 n. 46 (3d Cir.), *cert. denied*, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 17 (1978). The burden of proof is upon the defendant in this case to establish truth. *See* 42 Pa.C.S.A. § 8343(b). Defendant has submitted an extensive affidavit giving detailed explanations and instances of the criticisms he made in his review (*e.g.*, noting which photographs were not listed in the chronology, which captions contained errors and what they were), and also indicating errors which he had not mentioned in his review. *See* Defendant's Affidavit (filed Oct. 17, 1986) at 4–31. Defendant contends that plaintiff's admission of the existence of errors in the book, *see* Plaintiff's Supplemental Memorandum at 7, entitles defendant to summary judgment on the issue of truth.

 Plaintiff, in response, argues that (1) the defense of truth must extend to any innuendo in the review, and (2) that he and "other experts have a serious difference of opinion with Mr. Gladstone as to a number of photographs in the Book (*i.e.* date of the photograph, place of the photograph, rank of Custer at the time of the photograph, etc.)". Plaintiff's Affidavit in opposition to Motion for Summary Judgment (filed Nov. 24; 1986) ("Plaintiff's Affidavit") at ¶ 25. Although plaintiff is correct that the defense of truth would have to extend to any defamatory innuendo, *see Friday v. Official Detective Stories, Inc.*, 233 F.Supp. 1021, 1023 (E.D.Pa.1964), this court finds that

the review does not contain the innuendo alleged by plaintiff, so this observation is to no avail. Plaintiff's attempt to cast the criticisms of the review as mainly opinion, *see* Plaintiff's Supplemental Memorandum at 7, is also not successful as a means of avoiding the burden of demonstrating that there are genuine issues of material fact making summary judgment on the basis of truth inappropriate.

 The question, therefore, is whether plaintiff's general assertion of differences of opinion as to the alleged factual inaccuracies in the book is sufficient to defeat a motion for summary judgment grounded on the defense of truth. The answer is no: the party opposing summary judgment must provide a factual basis for its opposing allegations; he may not rely on "mere speculation or conjecture as to the true nature of the facts." *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986), *cert. denied,* — U.S. —, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Such conclusory statements in support of the accuracy of plaintiff's book will not suffice to require a trial.

### 3. Protected Opinion and Defendant's Motives

Defendant claims that he is also entitled to summary judgment on the grounds of either an absolute privilege, appealing to the doctrines of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), or a qualified privilege. *See* Defendant's Memorandum at 9. Defendant has not, however, brought to our attention a case establishing the existence of an absolute privilege in the circumstances presented to us, of a private-figure plaintiff suing a "nonmedia" defendant. We proceed, therefore, to consideration of whether defendant is entitled to the protection of a qualified privilege.

 The plaintiff does not contest that a book review provides a proper occasion for invoking a qualified privilege, and the defendant does not contest that a showing of malicious motivation would defeat the privilege. The focus of their disagreement is on whether there is sufficient evidence of malicious motivation on the part of defendant to prevent the granting of summary judgment. *See* Plaintiff's Memorandum at 12–18; Plaintiff's Supplemental Memorandum at 5–6; and Defendant's Memorandum at 12–13.

Plaintiff argues that summary judgment is improper here because defendant's motivation is placed in dispute by the deposition of a witness who allegedly overheard defendant state that he intended to "get even" with plaintiff by "writing a bad review." Plaintiff's Memorandum at 17; Plaintiff's Supplemental Memorandum at 6; and Plaintiff's Affidavit Exhibit E. Plaintiff asserts that defendant's allegedly malicious motivation is a material and disputed fact rendering summary judgment improper.

Were defendant's review capable of being construed as defamatory in content, and were it false, it is arguable that the affidavit of plaintiff's witness would render summary judgment based upon privilege improper, because malicious motivations would defeat the defendant's qualified privilege. *See Bausewine v. Norristown Herald*, 351 Pa. 634, 645–46, 41 A.2d 736, 741, *cert. denied*, 326 U.S. 724, 66 S.Ct. 29, 90 L.Ed. 429 (1945); *Berg v. Consolidated Freightways, Inc.*, 280 Pa.Super. 495, 501, 421 A.2d 831, 834 (1980); *Preveden*, 98 F.Supp. at 786. The disputed facts regarding the abuse of privilege are not material, however, where, as here, the published review is in no sense defamatory. Mere malicious intent without ultimate dafamatory result provides no basis for recovery in a libel action.

### CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted. Judgment shall enter for defendant on plaintiff's complaint.

It is so ordered.